IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. H-11-3718 |
| BNP PARIBAS SA; BNP PARIBAS | § | |
| NORTH AMERICA; BNP PARIBAS | § | |
| HOUSTON AGENCY; and JOVENAL | § | |
| MIRANDA CRUZ, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, the United States of America, brings this action against defendants, BNP Paribas SA, BNP Paribas North America, BNP Paribas Houston Agency (collectively "BNPP defendants"), and Jovenal Miranda Cruz, under the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq., and for unjust enrichment and payment by mistake. Pending before the court are the Motion to Dismiss the Complaint by Defendants BNP Paribas, BNP Paribas North America, Inc., and BNP Paribas Houston Agency (Docket Entry No. 22), and Defendant Jovenal Miranda Cruz's Motion to Adopt in Part Motion to Dismiss Complaint by BNPP (Docket Entry No. 25). For the reasons set forth below, the motion to dismiss filed by defendant Cruz will be denied, and the motion to dismiss filed by the BNPP defendants will be granted in part and denied in part, and the United States will be ordered to file an amended complaint within thirty (30) days.

## I.  **Background**

From 1998 through 2005, a number of individuals and companies schemed and conspired to exploit the Supplier Credit Guarantee Program ("SCGP") pursuant to which the Commodity Credit Corporation ("CCC"), a federally chartered corporation within the United States Department of Agriculture ("USDA"), issues guarantees to United States commodity exporters.  The SCGP allows United States commodity exporters to access financing before payments are due from foreign importers.  Under this program exporters assign to a financial institution both the importer's promissory note and the exporter's right to payment, and the CCC guarantees payment to a financial institution.  Eligibility requirements barred exporters from participating in the SCGP if they were directly or indirectly owned or controlled by the foreign importer, or by a person or entity that owned or controlled the importer.

The scheme at issue involved exporters and importers that were owned and/or controlled by Fernando Pablo Villarreal Cantu (Villarreal), a citizen of Mexico.  Villarreal's ownership and/or control of both the exporters and the importers meant that the exporters were not eligible to receive SCGP guarantees from the CCC.  As part of the scheme, the criminal co-conspirators bribed defendant Jovenal Miranda Cruz (Cruz) who at the relevant time served as a Vice-President and Manager of Trade Finance for BNPP in Houston.  Largely through Cruz, BNPP entered into a series of Master Purchase and Sale Agreements ("MPSAs") with several

-2-

United States Exporters ("Exporters") pursuant to which BNPP agreed to provide financing to the Exporters in exchange for receipt of payment obligations from a series of corresponding Mexican Importers ("Importers") and SCGP guarantees for those payment obligations.  The MPSAs detailed the income BNPP would earn for each transaction.  Using false documents the Exporters, acting with the assistance and knowledge of Villarreal, the Importers, and Cruz, applied for and received SCGP guarantees.  Upon receipt of a CCC guarantee, the Exporters assigned the guarantee and the Importers' payment obligation to BNPP.  In exchange, BNPP provided the Exporters a line of credit up to the amount of the guarantee minus the amount BNPP charged for the service.

Beginning in April of 2005 the Mexican Importers failed to make over $78 million in payments due to BNPP.  BNPP promptly filed claims on the CCC guarantees to recover its losses.  BNPP filed its last claim on September 15, 2005.  The CCC and the USDA referred the defaults to the United States Attorney's Office in Houston ("USAO").  A subsequent investigation resulted in the indictment of several individuals, including Cruz.  The indictments charged Cruz and his co-conspirators with various acts, including "knowingly mak[ing] a false statement for the purpose of influencing the action of BNP Paribas . . . in connection with advance or draw requests for funds on lines of credit."[1]  On January 12, 2012, Cruz

---

[1]Criminal Indictment filed in Criminal Action No. H-10-179, Exhibit 2 to BNPP's Motion to Dismiss, Docket Entry No. 22, p. 34.

pleaded guilty to conspiracy to commit bank fraud and other charges.

On October 18, 2011, the United States filed this action against BNPP based on allegations that BNPP and Cruz knew the Exporters were not eligible for the SCGP guarantees, yet concealed that information from the CCC and the USDA. The United States also alleges that Cruz acted within the scope of his employment and for the benefit of his employer in acquiring and maintaining this business for BNPP. (Compl. ¶¶ 15, 41-44)

## II.   <u>Standards of Review</u>

Defendants move the court to dismiss the plaintiff's claims pursuant to Federal Rules of Civil Procedure 12(b)(6) for failure to state a claim for which relief may be granted and 9(b) for failure to plead fraud with particularity. "A dismissal for failure to plead fraud with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6)." <u>United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.</u>, 125 F.3d 899, 901 (5th Cir. 1997).

## A.   **Federal Rule of Civil Procedure 12(b)(6)**

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim for which relief may be granted tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." <u>Ramming v. United States</u>, 281 F.3d 158, 161

-4-

(5th Cir. 2001), <u>cert. denied sub nom</u> <u>Cloud v. United States</u>, 122 S.Ct. 2665 (2002). The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. <u>Id.</u>

> When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.

<u>Swierkiewicz v. Sorema N.A.</u>, 122 S.Ct. 992, 997 (2002). To avoid dismissal a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atlantic Corp. v. Twombly</u>, 127 S.Ct. 1955, 1974 (2007). Plausibility requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. <u>Id.</u> The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility a defendant acted unlawfully. <u>Id.</u> "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief." <u>Torch Liquidating Trust ex rel. Bridge Associates L.L.C. v. Stockstill</u>, 561 F.3d 377, 384 (5th Cir. 2009). When considering a motion to dismiss courts generally are limited to the complaint and its proper attachments.

_Dorsey v. Portfolio Equities, Inc._, 540 F.3d 333, 338 (5th Cir. 2008).  However, courts may rely upon "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  _Id._

## B.   **Federal Rule of Civil Procedure 9(b)**

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "[A complaint filed under the False Claims Act must meet the heightened pleading standard of Rule 9(b)."  _United States ex rel. Grubbs v. Kanneganti_, 565 F.3d 180, 185 (5th Cir. 2009).  Pleading fraud with particularity in this circuit requires "[a]t a minimum . . . the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  _Benchmark Electronics, Inc. v. J.M. Huber Corp._, 343 F.3d 719, 724 (5th Cir. 2003).  The Fifth Circuit has explained that

> [i]n cases of fraud, Rule 9(b) has long played [a] screening function, standing as a gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later.  We apply Rule 9(b) to fraud complaints with "bite" and "without apology," but also aware that Rule 9(b) supplements but does not supplant Rule 8(a)'s notice pleading. Rule 9(b) does not "reflect a subscription to fact pleading" and requires only "simple, concise, and direct" allegations of the "circumstances constituting fraud," which after _Twombly_ must make relief plausible, not merely conceivable, when taken as true.

-6-

Grubbs, 565 F.3d at 185-86 (citing Twombly, 127 S.Ct. at 1955).

"Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

### III.  Analysis

The United States asserts both statutory claims for violation of the FCA, 31 U.S.C. § 3729, et seq., and common law claims for unjust enrichment and payment by mistake against each of the four defendants.  These claims are all based on allegations that "from 1998 through 2006 (the 'Relevant Time Period'), BNP and its former Vice President, Jerry M. Cruz, engaged in a scheme to defraud the United States in connection with commodity payment guarantees provided by the U.S. Department of Agriculture ('USDA') under its Supplier Credit Guarantee Program ('SCGP')."[2]  The BNPP defendants argue that the complaint should be dismissed because the United States is judicially estopped from bringing its claims, and because the asserted claims are time barred and/or legally flawed.[3]  Cruz adopts BNPP's argument that the United States' claims are time-barred.[4]

---

[2]United States' Complaint, Docket Entry No. 1, pp. 1-2 ¶ 2.

[3]Motion to Dismiss the Complaint by Defendants BNP Paribas, BNP Paribas North America, Inc., and BNP Paribas Houston Agency ("BNPP's Motion to Dismiss"), Docket Entry No. 22.

[4]Defendant Jovenal Miranda Cruz's Motion to Adopt in Part Motion to Dismiss Complaint by BNPP ("Cruz's Motion to Dismiss"), Docket Entry No. 25.

-7-

**A.    United States' Claims Are Not Judicially Estopped**

Asserting that

[t]he government has prosecuted six individuals in this
district for bank fraud based upon their effort to
defraud BNPP and other institutions[, and that
t]hroughout those proceedings, the government has
repeatedly explained to the district court that BNPP was
a <u>victim</u> of Cruz and his co-conspirators' scheme,[5]

the BNPP defendants argue that "[a]fter repeatedly and deliberately

taking the position that BNPP is the victim of the fraud, the

government should be judicially estopped from now asserting the

opposite — that BNPP is liable as the perpetrator."[6]  In support of

this argument the BNPP defendants have summarized and quoted

documents in <u>United States v. Cantu, et al.</u>, 4:10-cr-00179 (S.D.

Tex.), e.g., the indictment, a press release issued by the USAO,

Plea Agreements entered by Cruz, Javier Heriberto Hinojosa, and

. . . . Villalon, and the motions in limini.

The United States argues that its FCA and common law claims

are not judicially estopped because

[e]stoppel rarely applies against the United States . . .
and BNPP does not cite any case judicially estopping the
government based on positions taken in a criminal
proceeding.  Even if it could, BNPP also failed to
identify a single inconsistency between the
United States' position in the criminal proceedings and
those stated in the Complaint.  BNPP merely posits that
it is inconsistent to refer to the Bank as the "victim"

---

[5]Memorandum of Points and Authorities in Support of BNPP's
Motion to Dismiss, Docket Entry No. 22-1, p. 9.

[6]<u>Id.</u>

of a criminal fraud and then pursue the Bank for civil
FCA liability.[7]

The United States explains that

> BNPP is not a "victim," and the United States did not
> suggest otherwise in the criminal proceedings.  The facts
> surrounding BNPP's role in the criminal enterprise are
> entirely consistent with the facts alleged by the
> United States in the Complaint.  The mere fact that some
> Bank employees were lied to as part of the conspiracy to
> defraud the USDA is not inconsistent with the fact that
> BNPP, nevertheless, participated in the scheme to defraud
> and is liable for the knowing submission of false and
> fraudulent claims to the United States.[8]

"[J]udicial estoppel prevents a party from asserting a claim
in a legal proceeding that is inconsistent with a claim taken by
that party in a previous proceeding."  Reed v. City of Arlington,
650 F.3d 571, 573-74 (5th Cir. 2011).  Judicial estoppel "is 'an
equitable doctrine invoked by the court at its discretion' to
'protect the integrity of the judicial process,'" id. at 574, by
preventing parties from "playing fast and loose with (the courts)
to suit the exigencies of self interest."  Brandon v. Interfirst
Corp., 858 F.2d 266, 268 (5th Cir. 1988).  The Fifth Circuit has
recognized that the doctrine of judicial estoppel does not apply
unless (1) the position of the party to be estopped is plainly
inconsistent with its previous position, (2) the court accepted the

---

[7]Opposition to Motion to Dismiss the Complaint by Defendants
BNP Paribas, BNP Paribas North America, Inc. and BNP Paribas
Houston Agency ("United States' Opposition to BNPP's Motion to
Dismiss"), Docket Entry No. 32, p. 4.

[8]Id. at 4-5.

previous position, and (3) the party did not act inadvertently. Reed, 650 F.3d at 574.

The BNPP defendants have not attempted to show that the United States' position in this case is clearly inconsistent with a position taken by the United States in a related criminal proceeding, or that the court in a related criminal proceeding accepted the United States' clearly inconsistent position. Instead, citing the criminal prosecutions of Cruz and his co-conspirators, the BNPP defendants argue that "the government has repeatedly explained to the district court that BNPP was a victim of Cruz and his co-conspirators' scheme."[9]  However, the BNPP defendants have not cited a single document in which the United States refers to BNPP as a "victim."  Instead, the BNPP defendants have cited documents showing that Cruz and his co-conspirators knowingly provided false information to BNPP.  But the fact that false information was provided to BNPP as part of the conspiracy to defraud the United States is not necessarily inconsistent with the United States' allegations that BNPP is liable for the knowing submission of false and fraudulent claims to the United States.  See United States v. Hemmingson, 157 F.3d 347, 356 (5th Cir. 1998) (rejecting defendant's contention that the government assumed "inconsistent litigating positions" by prosecuting a company as a defendant in one action seeking to hold

---

[9]Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22-1, p. 9.

the company vicariously liable for an officer's bad acts, and portraying the same company as a victim in the criminal prosecution of the company officer). See also United States v. Crop Growers Corp., 954 F.Supp. 335, 343 (D.D.C. 1997) (recognizing that a corporation "can be both a victim and a participant in crimes arising out of the same facts" and that "a basic principal of corporate law [is] that, in a shareholder derivative suit, a corporation plays the role of both plaintiff and defendant"). The court therefore concludes that the United States is not judicially estopped from pursuing this action.

**B.  United States' Claims Are Not Affirmatively Time Barred**

Defendants argue that the United States' Complaint should be dismissed because the United States' FCA claims and common law claims are all time-barred.  "[A] complaint may be subject to dismissal if its allegations affirmatively demonstrate that the plaintiff's claims are barred by the statute of limitations and fail to raise some basis for tolling." Frame v. City of Arlington, 657 F.3d 215, 240 (5th Cir. 2011), cert. denied, 132 S.Ct. 1561 (2012) (citing Jones v. Bock, 127 S.Ct. 910 (2007)).  See also Jones v. Alcoa, Inc., 339 F.3d 359, 366 (5th Cir. 2003) ("A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling . . .").

1.  <u>FCA Claims Are Not Time Barred</u>

The following language from the FCA provides a six-year statute of limitations and a three-year tolling period, and bars the United States from filing FCA claims over ten years old:

> A civil action . . . may not be brought --
>
> (1)  more than 6 years after the date on which the violation of [the statute] is committed, or
>
> (2)  more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed.

31 U.S.C. § 3731(b).

Defendants argue that the United States' FCA claims are time barred because

> Plaintiff's own allegations show that the FCA's six-year statute of limitations has expired. As the Fifth Circuit has held, the FCA limitations period commences when a claim is submitted.  BNPP submitted all of its claims by September 15, 2005.  Compl. ¶ 48 (listing "Date Claim Received" for each claim).  Thus, the FCA's six-year statute of limitations expired on September 15, 2011 — more than one month before Plaintiff filed its Complaint on October 18, 2011. For this reason, all of Plaintiff's FCA claims must be dismissed as untimely.[10]

Defendants argue that "[t]he FCA's three-year tolling provision does not save Plaintiff's FCA claims because long ago 'facts

---

[10]Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22-1, p. 10.  <u>See also</u> Cruz's Motion to Dismiss, Docket Entry No. 25, p. 1 (adopting the BNPP defendants' arguments that the United States' claims are time-barred).

material to the right of action [were] known or reasonably should have been known,'"[11] and because "the Wartime Suspension of Limitations Act [("WSLA") [d]oes [n]ot [s]ave Plaintiff's FCA [c]laims."[12]  The United States responds that the BNPP defendants' contention that its claims are time barred

> fails for three reasons: (1) by operation of the Wartime Suspension of Limitations Act . . . [WSLA], 18 U.S.C. § 3287, the statute of limitations on all of the United States' FCA claims are suspended; (2) the FCA's three-year tolling provision prevents dismissal of the action; and (3) many of the claims in question fall squarely within the FCA's six-year limitation period.[13]

Although the court concludes that the United States' FCA claims do not fall squarely within the FCA's six-year limitation period, the court also concludes that these claims are not subject to dismissal because whether they are subject to the FCA's three-year tolling provision is a question of fact that cannot be resolved on the pleadings alone, and because the WSLA acts to suspend the FCA's statute of limitations.

<blockquote>(a)  The United States' Claims Do Not Fall Squarely Within the FCA's Limitation Period</blockquote>

Asserting that "[f]alse claims paid after October 18, 2005 fall within the FCA's six-year statute of limitations,"[14] the

---

[11]Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22-1, p. 10.

[12]Id. at 11.

[13]United States' Opposition to BNPP's Motion to Dismiss, Docket Entry No. 32, p. 6.

[14]Id. at 14.

United States argues that "many of the claims in question fall squarely within the FCA's six-year limitation period."[15]   The United States' contention that the limitations period for FCA claims is computed from the date the claim is paid is precluded by the Fifth Circuit's holding in <u>Smith v. United States</u>, 287 F.2d 299 (5th Cir. 1961), that the limitations period for FCA claims is computed from "the date on which the violation of [the FCA] is committed," and that the "violation" is the submission — not the payment — of a false claim.  <u>Id.</u> at 303-04 ("The six-year period is to be computed from the time of 'the commission of the act,' 31 U.S.C.A. § 235.  The 'act' in question is the filing of the false claim.").  <u>See also</u> <u>Graham County Soil & Water Conservation District v. United States ex rel. Wilson</u>, 125 S.Ct. 2444, 2449 (2005) (time limit for FCA claims begins to run on the date the defendant submitted a false claim for payment.

> (b)   The United States' Complaint Raises Questions of Fact Regarding Applicability of the FCA's Three-Year Tolling Provision

Asserting that "[t]he FCA's six-year limitation period may be tolled for three years from the date when 'facts material to the right [of] action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances,'"[16] the United States argues that its

---

[15]<u>Id.</u> at 6.

[16]<u>Id.</u> at 12.

complaint should not be dismissed because "[d]etermining whether the statute was tolled is a fact intensive analysis that cannot be decided on the pleadings. . . A full record must be developed in discovery and, only then can this issue be determined on summary judgment or at trial."[17]   Defendants contend that this argument lacks merit because

> [t]he government was on notice of potential civil claims when BNPP in 2005 submitted 238 claims totaling almost $80 million based upon virtually simultaneous defaults by four Importers. Compl. ¶ 48. In fact, the government concedes that in response it immediately commenced a grand jury investigation of the circumstances surrounding the defaults by "August 11, 2005" — weeks before BNPP even finished submitting its claims in September 2005. Compl. ¶ 52. See Ex. 23 & 24 (issuing subpoenas in 2005 and 2006 to BNPP).
>
> No matter how these circumstances are analyzed, the government is not entitled to tolling. Either the government knew through its criminal investigation of BNPP's alleged role in the underlying conduct or the Civil Division failed to act diligently by launching an investigation based on BNPP's substantial claims. Indeed, the Department of Justice is required to timely investigate civil claims with coordination between criminal and civil officials. See 31 U.S.C. § 3730(a) (requiring Attorney General to "diligently . . . investigate a violation under section 3729" and "bring a civil action under this section" where appropriate); U.S. Attorneys' Manual, § 9-42.010(C) (Ex. 25) ("Cases pursued criminally must also be analyzed for civil potential. This analysis should be conducted at the earliest possible stage." (emphasis added)). The Civil Division made no timely effort to investigate its potential civil claims and now trots out a litany of excuses for sleeping on its obligations. Its lack of diligence is no basis for tolling.[18]

---

[17]Id.

[18]Reply Memorandum of Points and Authorities in Support of Motion to Dismiss the Complaint by Defendants BNP Paribas, BNP
(continued...)

In support of their argument that the United States is not able to rely on the FCA's three-year tolling provision, defendants cite a number of cases in which courts have denied plaintiffs the benefit of tolling, e.g., United States v. Incorporated Village of Island Park, 791 F.Supp. 354, 364 (E.D.N.Y. 1992) (concluding that DOJ should have known of alleged fraud when government released cabinet-level audit report alleging wrongdoing because "it cannot be but that the Department of Justice 'should have . . . known' through the exercise of 'due diligence' about these matters at the time that they were well known throughout the rest of the United States government"); United States, ex rel. Kreindler & Kreindler v. United Techs. Corp., 777 F.Supp. 195, 205 (N.D.N.Y. 1991) (dismissing FCA claims where "facts material to relator's cause of action were known . . . by the senior officials in charge of the . . . project"); United States ex rel. Purcell v. MWI Corp., 520 F.Supp.2d 158, 170 (D.D.C. 2007) ("courts apply a 'discovery-due diligence' standard" that "begins to run when the government official charged with bringing the civil action 'discovers, or by reasonable diligence could have discovered, the basis of the lawsuit'"); United States ex rel. Miller v. Bill Harbert International Construction, 505 F.Supp.2d 1, 14 (D.D.C. 2007) (concluding that Civil Division attorneys did not exercise due diligence in pursuing FCA claims where they "made no attempts to

---

[18](...continued)
Paribas North America, Inc., and BNP Paribas Houston Agency ("BNPP's Reply"), Docket Entry No. 37, pp. 3-4.

investigate the bid-rigging allegations under their own efforts"). Because none of these cases involved a Rule 12(b)(6) motion to dismiss but, instead, involved either a motion for summary judgment following discovery, or a motion for judgment as a matter of law following an evidentiary hearing, they do not support the defendants' contention that the claims asserted in this action are subject to dismissal as time barred on the pleadings.

The allegations contained in the United States' Complaint make clear that the question of whether this action was filed "more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances," 31 U.S.C. § 3731(b)(2), is a question of fact that cannot be answered based solely on the pleadings before discovery has begun.  The Complaint alleges that the

> USDA referred the commodity guarantee scheme to the United States Attorney's Office for the Southern District of Texas (USAO), Criminal Division, in or about June or July 2005, for investigation.  An investigation of the scheme by the USAO, Criminal Division, did not commence before August 11, 2005.  On March 24, 2010, Cruz, Villarreal, See, Gonzalez, Hinojosa and Villalon were indicted on charges pertaining to the scheme.  On information and belief, the official of the United States charged with responsibility to act in the circumstances did not know nor should have known the facts material to the right of action any earlier than October 19, 2005, and the United States believes it is probable that the date is later.[19]

---

[19]United States' Complaint, Docket Entry No. 1, p. 20 ¶ 52.

-17-

This excerpt from the Complaint alleges that as of October 19, 2005, the United States official charged with responsibility to act neither knew nor should have known of the material facts. Accordingly, the court concludes that the United States' Complaint is not subject to dismissal under Rule 12(b)(6) because the Complaint's allegations do not affirmatively demonstrate that the plaintiff's claims are barred by the statute of limitations and do raise some basis for tolling.  See Frame, 657 F.3d at 240.

### (c)   WSLA Suspends the FCA's Statute of Limitations

The United States argues that the FCA claims were timely filed because the WSLA, as amended by the Wartime Enforcement of Fraud Act of 2008 ("WEFA"), 18 U.S.C. § 3287, suspends the FCA's statute of limitations for the United States' FCA claims.  Defendants argue that the WSLA does not apply to the United States' FCA claims.

### (1)   Applicable Law

Congress initially enacted the WSLA for World War I, 42 Stat. 220, and repealed it in 1927.  In 1942 Congress re-enacted the WSLA temporarily for World War II to extend the time prosecutors had to bring charges relating to criminal fraud offenses against the United States, 56 Stat. 747.  "Both statutes were similar and extended the statute of limitations as to any 'offenses involving the defrauding or attempts to defraud the United States . . . and now indictable under any existing statutes.'"  Dugan & McNamara, Inc. v. United States, 127 F.Supp. 801, 802 (Ct. Cl. 1955).  In

1944 the WSLA was amended to reach violations of the Contract
Settlement Act of 1944. "In so doing the phrase 'now indictable
under existing statutes' was deleted." Id. (citing 58 Stat. 649,
667, 41 U.S.C. § 101, et seq.). In 1948 the WSLA was codified "as
permanent legislation to be applicable whenever the country is at
war." Id.

In 2005 when the claims at issue in this action were submitted
for payment, WSLA provided, in relevant part,

> [w]hen the United States is at war . . . the running of
> any statute of limitations applicable to any offense
> (1) involving fraud or attempted fraud against the
> United States or any agency thereof . . ., shall be
> suspended until five years after the termination of
> hostilities as proclaimed by the President or by a
> concurrent resolution of Congress.

18 U.S.C. § 3287. The Fifth Circuit has explained that

> [t]he WSLA has three components: (1) a triggering clause
> ("When the United States is at war the running of [the
> applicable statute of limitations] shall be suspended
> . . ."), (2) a suspension period ("three years"), and
> (3) a termination clause ("suspended until . . . after
> the termination of hostilities as proclaimed by the
> President or by a concurrent resolution of Congress.").

United States v. Pfluger, ____ F.3d ____, 2012 WL 2345027, *2 (5th
Cir. June 21, 2012). In United States v. Smith, 72 S.Ct. 260, 261
(1952), the Supreme Court held that the WSLA applied only to
offenses committed after the triggering of the suspension of
limitations but before the termination of hostilities. The Supreme
Court explained that "under our construction the . . . period
prescribed by the [WSLA] starts to run at the date of termination
of hostilities . . . No reasons of policy are suggested for

-19-

straining the language of the Act to suspend the running of the statute beyond the emergency which made the suspension seem advisable." Id. at 262.

Effective October 14, 2008, Congress amended the WSLA through the WEFA, Pub.L. No. 110-417 § 855, to expand its operation to times "[w]hen the United States is at war or *Congress has enacted a specific authorization for the use of the Armed Forces, as described in section 5(b) of the War Powers Resolution (50 U.S.C. 1544(b))."* 18 U.S.C. § 3287 (2011) (change in italics). The amendment also extended the suspension period until "5 years after the termination of hostilities as proclaimed by the Presidential proclamation, with notice to Congress, or by a concurrent resolution of Congress." Id.

The United States contends that the amended WSLA applies to BNPP's conduct.[20]  Courts are in conflict as to whether the post-amendment WSLA should apply to offenses that occurred before passage of the 2008 amendments. Compare United States v. Anghaie, No. 1:09-CR-37, 2011 WL 720044, at *2 (N.D. Fla. Feb. 21, 2011) (applying post-amendment WSLA to counts for which the limitations period would have expired after the amendment) with United States v. Pearson, No. 2:09cr43, 2010 WL 3120038, at *1 (S.D. Miss. Aug. 4, 2010) (applying pre-amendment WSLA to offenses that

---

[20]United Stats' Opposition to BNPP's Motion to Dismiss, Docket Entry No. 32, pp. 6-7.

occurred prior to the amendment).  Courts are similarly in conflict
as to whether the pre-amendment WSLA requires a formal declaration
of war or whether the authorized use of military force suffices.
Compare United States v. Shelton, 816 F.Supp. 1132, 1135 (W.D. Tex.
1993) (pre-amendment WSLA requires congressional declaration of
war), with Pearson, 2010 WL 3120038, at *1-2 (citing United States
v. Prosperi, 573 F.Supp.2d 436, 455-56 (D. Mass. 2008) (in support
of conclusion that the United States was "at war" for purposes of
the pre-amended WSLA during the Afghanistan and Iraq conflicts that
began in 2001 and 2002)).

#### (2)   Application of the Law to the Facts

Defendants   argue   that   the   WSLA   does   not   save   the
United States' FCA claims because "the WSLA does not apply in civil
FCA cases"[21] and because even if the WSLA does apply to civil FCA
cases, the United States was not "at war" in 2005 when the acts
underlying the FCA claims alleged in this case occurred.[22]

#### (i)   Application of WSLA to Civil FCA Cases

Defendants argue that the WSLA does not apply to civil FCA
cases because the FCA's six-year statute of limitations and
attendant   three-year   tolling   period   provide   the   exclusive

---

[21]Memorandum of Points and Authorities in Support of BNPP's
Motion to Dismiss, Docket Entry No. 22-1, p.  11.

[22]Id. at 14-15.

limitations period applicable to FCA claims.[23]   Defendants also argue that because the "WSLA, by its own terms, only tolls the period applicable to an 'offense' involving fraud,"[24] WSLA's application is limited to criminal cases.[25]

(A)   WSLA   Suspends   FCA's   Statute   of Limitations

The FCA was first enacted in 1863, 12 Stat. 696.  The FCA made certain acts to defraud the government punishable by fine and imprisonment, and provided that any person who committed any of the prohibited acts should forfeit and pay to the United states the sum of $2,000 for each act and, in addition, double the amount of the damages.    The prohibited acts included the making of a claim against the United States knowing such claim to be false, fictitious, or fraudulent.  The different portions of the FCA have since been distributed throughout the United States Code.    The portion imposing criminal penalties is now 18 U.S.C. §§ 287 and 1001, and the portion imposing civil penalties is now 31 U.S.C. § 3729, which provides "for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the

---

[23]Id. at 11-12.

[24]Id. at 12.

[25]Id. at 12-13.

Government sustains because of the act of that person." 31 U.S.C. § 3729(1).

In <u>United States v. Grainger</u>, 73 S.Ct. 1069, 1071 (1953), the Supreme Court held that the WSLA applied to the statute of limitations relating to proceedings under that portion of the FCA that imposed criminal penalties.  Since the criminal portion of the FCA and the civil portion involved here both prohibit knowingly making a false, fictitious, or fraudulent claim against the United States and since the Supreme Court has held that such an act constitutes an "offense" within the scope of the WSLA when the United States proceeds against the wrongdoer by criminal prosecution, making such a claim would also appear to fall within the scope of the WSLA when the United States avails itself of the civil remedies afforded to it under 31 U.S.C. § 3729. Nevertheless, defendants argue that the WSLA applies only to criminal charges and not to civil claims.

Defendants argue that

> the WSLA does not apply in civil FCA cases because the FCA's six-year statute of limitations and attendant three-year tolling period in § 3731(b) (discussed above) are the exclusive statutes of limitations applicable in civil FCA cases.  In fact, the FCA itself makes this clear, stating definitively that a "civil action . . . <u>may not be brought</u>" unless that statute is satisfied. That restrictive language is so strong that the Fifth Circuit has characterized it as an "absolute limitations period" and for that reason has rejected any form of tolling that Congress omitted from the FCA.[26]

---

[26]<u>Id.</u> at 11.

In support of this argument defendants cite United States ex rel. Erskine v. Baker, No. 99-50034, 2000 WL 554644 (5th Cir. April 13, 2000) (per curiam), and United States v. Borin, 209 F.2d 145 (5th Cir.), cert. denied, 75 S.Ct. 33 (1954).   In Erskine, 2000 WL 554644, at *1-*2, the Fifth Circuit rejected the plaintiffs' argument that relators could take advantage of the equitable tolling provision in 31 U.S.C. § 3731(b)(2).   Reasoning that the language and the legislative history of § 3731(b)(2) made clear that relators cannot benefit from equitable tolling unless they are "in direct identity with the United States," the Fifth Circuit concluded that the relators could not benefit from "a tolling provision passed exclusively for the government's benefit." Id. at *1.   In reaching this conclusion, the Fifth Circuit cited Borin, 209 F.2d at 148-49, for its "finding that a much earlier version of the statute of limitations, which stated only that '[e]very [Fair Claims Act] suit shall be commenced within six years from the commission of the act, and not afterward," did not allow for equitable tolling." Id. *2. Defendants' reliance on Erskine and Borin is misplaced because, as the United States argues, those cases involved the judicially created doctrine of equitable tolling; they did not involve a tolling statute like the WSLA. Because the WSLA expressly applies to "any *statute of limitations* applicable to any offense," 18 U.S.C. § 3287 (emphasis added), the court concludes that the WSLA applies to the FCA's statute of limitations.

(B)   WSLA Applies in Civil Cases

Alternatively, the defendants argue that the WSLA suspends the FCA's statute of limitations in criminal cases and has no application in civil cases.  In support of this argument defendants assert that the "WSLA, by its own terms, only tolls the period applicable to an 'offense' involving fraud,"[27] and that historically "an offense . . . did not include a civil cause of action given the 'ordinary, contemporary, common meaning' of the statutory language at the time of its enactment in 1948."[28]  In support of this argument defendants assert that

> [h]ad Congress intended to apply the WSLA to civil actions it certainly knew how to do so.  Just before Congress enacted the WSLA's "offense" language, it enacted in 1942 (and amended in 1945) the War-Time Tolling Statute using markedly different language: that statute tolled the running of statutes of limitations applicable to "violations of the antitrust laws of the United States, now indictable <u>or subject to civil proceedings</u>."  Congress, however, did not use that language in the WSLA and restricted the WSLA to criminal cases.[29]

As additional support for this argument defendants cite <u>United States v. Weaver</u>, 107 F.Supp. 963, 966 (N.D. Ala. 1952), <u>rev'd on other grounds</u>, 207 F.2d 795 (5th Cir. 1953), for its statement that "the history of the [WSLA] . . . as reviewed in <u>United States v. Smith</u>, 342 U.S. 225, 72 S.Ct. 260, is persuasive

---

[27]<u>Id.</u> at 12.

[28]<u>Id.</u>

[29]<u>Id.</u> at 13.

-25-

to the conclusion that the Congress intended only to toll the running of existing statutes of limitations as a bar to criminal prosecutions."[30]  The <u>Weaver</u> court based its conclusion that the WSLA applies only to criminal actions on the Supreme Court's decision in <u>Smith</u>, 72 S.Ct. 260.  At issue in <u>Smith</u> was whether the WSLA applies to offenses committed after the date of the proclamation of termination of hostilities.  <u>Id.</u> at 261.  Because the question of whether the WSLA extended to civil claims was not at issue in <u>Smith</u>, neither <u>Smith</u> nor <u>Weaver</u> provides guidance on this issue.

With the exception of <u>Weaver</u>, 107 F.Supp. at 963, all other courts to have faced the issue of whether the WSLA applies to civil actions have concluded the WSLA applies to such actions.  Moreover, all of these courts have reached this conclusion either by analyzing WSLA's legislative history, analyzing the meaning of the word "offense," and/or by citing opinions that have analyzed WSLA's legislative history and/or the meaning of "offense."  <u>See</u>, <u>e.g.</u>, <u>Dugan & McNamara</u>, 127 F.Supp. at 803-04 (analyzing both the meaning of "offense" and WSLA's legislative history before concluding that amendments to WSLA enacted in 1944 made WSLA applicable to civil FCA actions); <u>United States v. Kolsky</u>, 137 F.Supp. 359, 362 (E.D. Pa. 1955) (same).  In <u>Dugan & McNamara</u>, 127 F.Supp. at 804, the court concluded that the term "offense" as used in the 1942 version

---

[30] <u>Id.</u>

-26-

of the WSLA referred only to criminal offenses, but that the 1944 amendments deleting the words "now indictable" made the WSLA applicable to all actions involving fraud against the United States regardless of whether the government sought criminal or civil penalties.  In reaching this conclusion the court reasoned that

> the term "offense" in statutory construction is not without difficulty.  Standing by itself we understand the term to have reference to a breach of law established for the protection of the public, usually, but not necessarily, involving criminal proceedings, as distinguished from an action to redress infringement of mere private rights for which a penalty is imposed or punishment inflicted by judicial proceeding . . . Here, however, we do not have the term standing apart.  The 1942 statute with the phrase "now indictable" spoke clearly of only criminal offenses.  The 1944 enactment deleted that phrase . . . This deletion leads us to the conclusion that the [WSLA] then became applicable to all actions involving fraud against the United States whether the Government should seek redress by criminal or civil means.

Id.  In Kolsky, 137 F.Supp. at 361, the court similarly concluded that the WSLA applied to civil claims as well as to criminal charges.  The court explained:

> It is agreed that the prior wartime suspension acts applied only to criminal action. 42 Stat. 220; 56 Stat. 747.  However, we think, the inclusion of civil actions was intended by the present Act.  In the prior statutes Congress had used appropriate language to show that it had intended to make said statutes applicable to criminal offenses only.  For example, it used the words, "now indictable".  If it wished the applicability of the present Act to be limited again to criminal offenses only it could have used similar words.  Congress did not, however, and it is our opinion that by failing to do so it thereby intended the Act to apply to civil offenses as well as criminal offenses.

> We think it is of no benefit to the defendant, Kolsky, that the present [WSLA] uses the word "offense"; for, said word is not synonymous with the word "crime". If it had been the intent of Congress to make said Act applicable to criminal actions only, instead of using the word "offense" it could have used such words as "crime", "criminal offense", etc.

Id.

Although defendants correctly argue that some courts have reached their conclusions that the WSLA applies to civil claims without analyzing the meaning of "offense," all the cases that the defendants cite in support of this argument relied on Dugan & McNamara, 127 F.Supp. at 801, and/or Kolsky, 137 F.Supp. at 359, in support of their conclusions. See, e.g., United States v. Temple, 147 F.Supp. 118, 120-21 (N.D. Ill. 1956) (citing Dugan & McNamara, 127 F.Supp. at 801, in support of conclusion that 1944 version of WSLA applied to civil FCA claims); United States ex rel McCans v. Armour & Co., 146 F.Supp. 546, 551 (D.D.C. 1956) (citing both Dugan & McNamara, 127 F.Supp. at 801, and Kolsky, 137 F.Supp. at 359, in support of its conclusion that the WSLA as amended in 1944 applied "to civil actions in addition to criminal proceedings"); United States v. Salvatore, 140 F.Supp. 470, 473 (E.D. Pa. 1956) (citing Kolsky, 137 F.Supp. at 359, in support of its conclusion that the 1944 version of WSLA applied to civil FCA claims). Defendants' attempt to counter the United States' position by citing directly to the WSLA's legislative history is not persuasive because the legislative history on which defendants rely pertains to the 1942 and earlier versions of the WSLA, i.e., versions of the

WSLA that all agree applied only to criminal actions.[31] See Dugan & McNamara, 127 F.Supp. at 804 (acknowledging that prior to the 1944 amendments the WSLA applied only to criminal actions).

Because defendants have failed to cite any persuasive authority in support of their contention that the WSLA applies only to criminal and not to civil actions, and because the court finds persuasive the analysis of the WSLA's legislative history, the analysis of the meaning of the word "offense," and the conclusion that the amendments to the WSLA made in 1944 extended the WSLA's application to civil actions made in Dugan & McNamara, 127 F.Supp. at 801, and in Kolsky, 137 F.Supp. at 359, the court concludes that defendants have failed to carry their burden of showing that the FCA claims asserted in this action should be dismissed as time barred because the WSLA applies only to criminal charges and does not apply to civil claims.

(ii)   United States Was "At War" in 2005

Defendants argue that

even if the WSLA had application to civil FCA cases, it would not toll claims related to BNPP's 2005 submission of claims. All of the courts that recently have analyzed the WSLA in criminal cases have either concluded that U.S. was never "at war" in Iraq and Afghanistan or that those conflicts had ended by 2003. Many of those courts have held that WSLA has no application to those conflicts because the term "at war" in the WSLA "requires a finding that it encompasses only those wars that have been formally declared by Congress." Indeed, Congress

_____

[31]See BNPP's Reply, Docket Entry No. 37, pp. 5-10, and Exhibits 29-30 and 32-35.

recently amended the WSLA because "at war" only covered declared wars.

But even those courts that have disagreed and found the U.S. "at war" in Iraq and Afghanistan would still not apply the WSLA here.  The WSLA only applies to offenses committed during the period of war.  *See United States v. Smith*, 342 U.S. 225, 227, 72 S. Ct. 260, 261 (1952) ("the Suspension Act is inapplicable to crimes committed after the date of termination of hostilities").  Both courts that have held that the United States was "at war" in Iraq and Afghanistan have concluded that those "wars" ended by May 1, 2003.[32]

Defendants' contention that "[a]ll of the courts that recently have analyzed the WSLA in criminal cases have either concluded that the U.S. was never 'at war' in Iraq and Afghanistan or that those conflicts had ended by 2003" is not accurate.  For the reasons explained below, the court concludes that the United States was "at war" in 2005 when the acts underlying the claims asserted in this action occurred.

(A)   Beginning of "At War" Status

Citing <u>Shelton</u>, 816 F.Supp. at 1135, and two unpublished district court cases from other jurisdictions, <u>United States v. Western Titanium, Inc.</u>, No. 08-cr-4229-JLS, 2010 WL 2650224 (S.D. Cal. July 1, 2010), and <u>Anghaie</u>, 2011 WL 720044, defendants argue that the "WSLA has no application to [the conflicts in Iraq and Afghanistan] because the term 'at war' in the WSLA 'requires a finding that it encompasses only those wars that have been formally

---

[32]Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22-1, pp. 14-15.

declared by Congress.'"[33]  Defendants explain that in 2008 "Congress
. . . amended the WSLA because 'at war' only covered declared
wars,"[34] and that because "the amendments were passed following the
events in 2005 that gave rise to this case . . . the amended
statute is not applicable here."[35]  Citing <u>Prosperi</u>, 573 F.Supp.2d
at 436, the United States argues that the Authorizations for Use of
Military Force issued by Congress with respect to the conflicts in
Iraq and Afghanistan are sufficient to deem the United States "at
war" for WSLA purposes.[36]

     The courts in <u>Shelton</u>, 816 F.Supp. at 1132, and <u>Prosperi</u>, 573
F.Supp.2d at 436, addressed the question of what constitutes "at
war" for purposes of the WSLA before the 2008 amendments and
reached opposite conclusions.  In <u>Shelton</u> 816 F.Supp. at 1135, the
court held that the United States was not "at war" during the 1991
conflict in Iraq because WSLA requires a formal declaration of war

---

[33]<u>Id.</u> at 14.

[34]<u>Id.</u> (citing Pub.L. No. 110-329, Div. C., Title VIII, § 8117,
122 Stat. 3574, 3647 (Sept. 30, 2008) (extending tolling to
congressionally authorized uses of military force), and S. Rep.
No. 110-431, at 4 (2008) ("[T]he ongoing military operations in
Iraq and Afghanistan are likely exempt from [the pre-amendment
version of the WSLA] because they were undertaken when Congress
authorized the use of military force, rather than by a formal
declaration of war.")).

[35]<u>Id.</u> at 14-15 n.8.  <u>See also</u> Notice of Supplemental Authority
by Defendants BNP Paribas, BNP Paribas North America, Inc., and BNP
Paribas Houston Agency, Docket Entry No. 45, pp. 1-2.

[36]United States' Opposition to BNPP's Motion to Dismiss, Docket
Entry No. 32, pp. 10-11.

that was never issued for that conflict.  In <u>Prosperi</u> the court held that the Authorization for Use of Military Force ("AUMF") issued by Congress on September 18, 2001, granting the President the power to use all "necessary and appropriate force" against "those nations, organizations or persons" responsible for 9/11 attacks, Pub.L. No. 107-40, 115 Stat. 224, and the Authorization for the Use of Military Force Against Iraq ("AUMFAI") on October 11, 2002, Pub.L. No. 107-243, 116 Stat. 1498, authorizing the use of military force, if necessary, to "remove from power the current Iraqi regime and promote the emergence of a democratic government to replace that regime," to defend the United States "against the continuing threat posed by Iraq," and to "enforce all relevant United Nations Security Council resolutions regarding Iraq," both provided a sufficient basis on which to conclude that the United States was "at war" as of the dates on which those authorizations were issued.  <u>Prosperi</u>, 573 F.Supp.2d at 450-54.  In support of this conclusion the court observed that "[e]ach authorization specifically states that it is 'intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution[, 50 U.S.C. § 1544(b)]." <u>Id.</u> at 450 (citing AUMF at 224, and AUMFAI at 1501).  The court also considered several factors including:  (1) the extent of congressional authorization, (2) whether the conflict was deemed "war" under accepted definitions of the term and international law, (3) the size, scope, and cost of the conflict, and (4) the

diversion of government resources that might have been expended on investigating frauds against the government.   Prosperi, 573 F.Supp.2d at 450-454.   Based on the thorough analysis of these factors conducted in Prosperi, the court concludes that the AUMF issued by Congress on September 18, 2001, and the AUMFAI issued by Congress on October 11, 2002, provide a sufficient basis on which to conclude that the United States was "at war" as of those dates.

Defendants' contention that the wars initiated by the AUMF and the AUMFIA ended before 2005 when the claims at issue in this action were submitted for payment fails in light of the Fifth Circuit's recent decision to the contrary in United States v. Pfluger, ____ F.3d ____, 2012 WL 2345027 (5th Cir. June 21, 2012). Because the defendant in Pfluger did not dispute that either the AUMF or the AUMFAI was sufficient to place the United States "at war," the court in that case was required to determine only "(1) what conditions serve to mark the termination of hostilities and (2) whether such conditions were in place prior to May 2004, when the last of [the defendant's] criminal conduct occurred." Id. at *2.  The Fifth Circuit rejected the conclusion reached in Prosperi, 573 F.Supp.2d at 454-55, that the war in Afghanistan ended on December 22, 2001, with the formal recognition of Hamid Karzai's government, and that the war in Iraq ended on May 1, 2003, when President George W. Bush proclaimed that major combat operations in Iraq had ended, concluding, instead, that "neither Congress nor the president met the formal requirements for

-33-

terminating the WSLA's suspension of limitations as of May 2004 (nor yet to this date)." Id. at *3 (citing Hamdi v. Rumsfeld, 124 S.Ct. 2633, 2642 (2004), for its statement that "[a]ctive combat operations against Taliban fighters apparently are ongoing in Afghanistan"). Based on the Fifth Circuit's finding in Pfluger that the wars initiated by the AUMF and the AUMFIA have not yet ended, the court concludes that the United States was "at war" for purposes of the WSLA in 2005 when the acts alleged in this action occurred.

### (iii)  WSLA's 2008 Amendments Apply to the United States' FCA Claims

Alternatively, the court concludes that the 2008 amendments to the WSLA, which recognized specific authorization for the use of Armed Force as described in § 5(b) of the War Powers Resolution, 50 U.S.C. § 1544(b), as sufficient to trigger the WSLA, apply to the FCA claims asserted in this action."   See Riddle v. Dyncorp International, Inc., 666 F.3d 940, 944 (5th Cir. 2012) ("Our precedent directs us to apply the statute of limitations that is in effect at the time a plaintiff files his complaint."). In Riddle the Fifth Circuit explained that the question of whether to apply a newly-enacted statute of limitations turns on whether the claims at issue expired before the effective date of the newly-enacted statute of limitations. Id. Although defendants argue that the 2008 amendments do not apply to the claims asserted in this action because the underlying acts at issue occurred in 2005, three years

prior to the 2008 amendments, those claims had not expired on the effective date of the amendments, i.e., October 14, 2008.  Because the acts underlying the United States' claims against defendants occurred in 2005, the FCA's six-year statute of limitations had not expired when in 2008 the WSLA was amended by WEFA.  Accordingly, the court concludes that the WSLA's 2008 amendments apply to the FCA claims asserted in this action.  Id.  See also FDIC v. Belli, 981 F.2d 838, 842 (5th Cir. 1993) (recognizing that although amendments to a statute of limitations will not revive expired claims, they are applicable to claims that are unexpired at the time of their enactment); Stogner v. California, 123 S.Ct. 2446, 2453 (2003) (recognizing that "extension of existing limitations periods is not ex post facto, 'provided,' 'so long as,' 'because,' or 'if' the prior limitations periods have not expired").

> 2.   United States' Common Law Claims Are Not Time Barred

Citing the statute of limitations for common law claims, 28 U.S.C. § 2415, defendants argue that the United States' claims for unjust enrichment and payment by mistake are time barred regardless of whether they are subject to the six-year period for claims "founded upon any contract" referenced in § 2415(a), or the three-year limitations period for claims "founded upon a tort" referenced in § 2415(b).[37]  Defendants argue that "Plaintiff's claims are time-barred because they — like the FCA claims — accrued on submission

---

[37]Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22-1, p. 15.

of the claims. . . As a result, Plaintiff suffered its alleged legal injury as of the claim date and its common law causes of action began to accrue at that time,"[38] i.e., September of 2005 -- more than six years before the United States filed this action on October 18, 2005.  Citing 28 U.S.C. § 2416(c), the United States argues in response that "[t]he limitations period for all actions under Section 2415 excludes the period during which 'facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances.'"[39]  The United States argues that § 2416(c) "extends, rather than tolls, the statute of limitations,"[40] that it is the defendants' burden to prove that the statute of limitations period has run, and that the defendants have failed to shoulder that burden.[41]

Section 2416 provides in relevant part:

> For the purpose of computing the limitations periods established in section 2415, there shall be excluded all periods during which--
>
> . . .
>
> (c) facts material to the right of action are not known and reasonably could not be known by an official of the

---

[38]Id. at 16.

[39]United States' Opposition to BNPP's Motion to Dismiss, Docket Entry No. 32, p. 15.

[40]Id.

[41]Id.

> United States charged with the responsibility to act in
> the circumstances.

28 U.S.C. § 2416(c).  The United States' Complaint alleges that the

> USDA referred the commodity guarantee scheme to the
> United States Attorney's Office for the Southern District
> of Texas (USAO), Criminal Division, in or about June or
> July 2005, for investigation.  An investigation of the
> scheme by the USAO, Criminal Division, did not commence
> before August 11, 2005.  On March 24, 2010, Cruz,
> Villarreal, See, Gonzalez, Hinojosa and Villalon were
> indicted on charges pertaining to the scheme.  On
> information and belief, the official of the United States
> charged with responsibility to act in the circumstances
> did not know nor should have known the facts material to
> the right of action any earlier than October 19, 2005,
> and the United States believes it is probable that the
> date is later.[42]

The facts alleged in this excerpt from the United States' Complaint

do not affirmatively establish that by October 19, 2005, facts

material to the right of action were known or reasonably could have

been known by a United States official responsible to act in the

circumstances.  Instead, the United States affirmatively alleges

that the official charged with responsibility to act in the

circumstances neither knew nor should have known facts material to

the right of action as of October 19, 2005, six years before the

date on which the United States filed this action.  Accordingly,

the court concludes that the question of when facts material to the

right of action were known or reasonably could have been known is

a question of fact, and that the United States' Complaint is not

subject to dismissal because the complaint's "allegations

---

[42]United States' Complaint, Docket Entry No. 1, p. 20 ¶ 52.

affirmatively demonstrate that the plaintiff's claims are barred by the statute of limitations and fail to raise some basis for tolling." Frame, 657 F.3d at 240.

## C.   Sufficiency of the United States' Claims

The BNPP defendants argue that the United States' Complaint should be dismissed because the FCA and common law claims asserted therein are legally flawed.

### 1.   United States' FCA Claims Sufficiently Allege the Knowing Submission of False Claims But Do Not Satisfy the Requirements of Rule 9(b)

The United States' Complaint asserts three FCA claims against all the defendants:  (1) Count One alleges that "Defendants BNP and Cruz violated the False Claims Act, 31 U.S.C. § 3729(a)(1), by knowingly presenting or causing to be presented to the United States Government, false or fraudulent claims for payment on the CCC commodity payment guarantees assigned to BNP by any of the U.S. Exporters";[43] (2) Count Two alleges that "Defendants BNP and Cruz violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2009) by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, which the United States paid";[44] and (3) Count Three alleges that "Defendants BNP and Cruz have violated the

---

[43]Id. at 21 ¶ 54.

[44]Id. at 21 ¶ 58.

provisions of the False Claims Act, 31 U.S.C. § 3729(a)(3) by knowingly conspiring to defraud the government by getting a false or fraudulent claim allowed or paid, and which the United States paid."[45]   The BNPP defendants argue that the United States' FCA claims

> fail as a matter of law because the Complaint (a) does not allege vicarious liability for the actions of a co-conspirator of the Exporters (Cruz) who received bribes, (b) does not allege any false claims filed by BNPP, and (c) does not plead fraud with particularity.[46]

    (a)  Applicable Law

The FCA prohibits three distinct, but overlapping practices, all of which are alleged in the United States' Complaint:  (1) the knowing presentment of a false claim to the Government,[47] (2) the knowing use of a false record or statement to get a false claim

---

[45]Id. at 22 ¶ 62.

[46]Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22-1, p. 17.

[47]See 31 U.S.C. § 3729(a)(1)(2003), which makes liable whoever "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States, a false or fraudulent claim for payment or approval."   In 2009 Congress passed the Fraud Enforcement and Recovery Act ("FERA"), Pub.L. No. 111-21, 123 Stat. 1617 (2009), which, inter alia, amended and renumbered §§ 3729(a)(1-3) as §§ 3729(a)(1)(A)-(c).   The 2009 amendments to the False Claims Act generally apply to conduct occurring on or after May 20, 2009, but the changes to § 3729(a)(1)(B) apply retroactively to all claims "pending on or after June 7, 2008." See U.S. ex rel. Steury v. Cardinal Health, Inc., 625 F.3d 262, 267 n.1 (5th Cir. 2010).

paid,[48] and (3) conspiracy to get a false claim paid.[49]  "The FCA applies to anyone who 'knowingly assist[s] in causing' the government to pay claims grounded in fraud, 'without regard to whether that person ha[s] direct contractual relations with the government.'"  United States ex rel. Riley v. St. Luke's Episcopal Hospital, 355 F.3d 370, 378 (5th Cir. 2004).  For FCA purposes

> the terms "knowing" and "knowingly" mean that a person, with respect to information--
>
> (1) has actual knowledge of the information;
>
> (2) acts in deliberate ignorance of the truth or falsity of the information; or
>
> (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b)(2003).[50]  The requisite intent is thus the knowing presentation of what is known to be false; "which means that a lie is actionable but not an error."  Riley, 355 F.3d at 376.  In United States v. Southland Management Corp., 326 F.3d 669, 682 (5th Cir. 2003) (en banc) (Judge Jones concurring), the Fifth Circuit explained that

---

[48]See 31 U.S.C. § 3729(a)(1)(B)(2009) which makes liable whoever "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

[49]See 31 U.S.C. § 3729(a)(3)(2003) which makes liable whoever "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid."

[50]The 2009 amendments reordered this section but did not effect any substantive change.  See 31 U.S.C. § 3729(b)(2009).

the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of [agency] regulations are not fraud unless the violator knowingly lies to the government about them. United States ex rel. Lamers v. City of Green Bay, 168 F.3d 1013, 1019 (7th Cir. 1999). Innocently made faulty calculations or flawed reasoning cannot give rise to liability. United States ex rel. Wang v. FMC Corp., 975 F.2d 1412, 1420-21 (9th Cir. 1992). Further, where disputed legal issues arise from vague provisions or regulations, a contractor's decision to take advantage of a position cannot result in his filing a "knowingly" false claim. See United States ex rel. Siewick v. Jamieson Science & Engineering, Inc., 214 F.3d 1372, 1378 (D.C. Cir. 2000); Hagood v. Sonoma County Water Agency, 81 F.3d 1465, 1478-79 (9th Cir. 1996).

The statute's definition of "knowingly" excludes liability for innocent mistakes or negligence. Id. at 681.

> (b)   Application of the Law to the Facts
>
> **(1)   The United States' Complaint Contains Enough Facts to Allege that BNPP Filed False Claims**

The BNPP defendants argue that the FCA claims "fail because BNPP's claims were not false."[51]  The BNPP defendants explain that

[t]he core problem for Plaintiff is that those claims were real and legitimate: Plaintiff actually issued the guarantees, BNPP actually paid over $78 million dollars for the receivables and importers' promissory notes, and those notes were not repaid. None of the claims submitted by BNPP was a factually false claim, which "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided."[52]

---

[51]Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22-1, p. 21.

[52]Id. at 21 (quoting United States ex rel. Bennett v. Boston Scientific Corp., No. H-07-2467, 2011 WL 1231577, at *13 (S.D. Tex. March 31, 2011).

-41-

The BNPP defendants' argument fails because in <u>United States</u>
<u>ex rel. Longhi v. Lithium Power Technologies, Inc.</u>, 575 F.3d 458
(5th Cir. 2009), <u>cert. denied</u>, 130 S.Ct. 2092 (2010), the Fifth
Circuit reaffirmed that long-standing principle that, "[i]n certain
cases, FCA liability may be imposed 'when the contract under which
payment is made was procured by fraud.'"  <u>Id.</u> at 467-68 (quoting
<u>United States ex rel. Willard v. Humana Health Plan of Texas, Inc.</u>,
336 F.3d 375, 384 (5th Cir. 2003)).  The Fifth Circuit explained
that "[t]his type of FCA claim is characterized as fraudulent
inducement.  Under a fraudulent inducement theory, although the
Defendants' 'subsequent claims for payment made under the contract
were not literally false, [because] they derived from the original
fraudulent misrepresentation, they, too, became actionable false
claims."  <u>Id.</u> at 468 (quoting <u>United States ex rel. Laird v.</u>
<u>Lockheed Martin Engineering & Science Services Co.</u>, 491 F.3d 254,
259 (5th Cir.), <u>cert. denied</u>, 128 S.Ct. 629 (2007).  The
United States' Complaint alleges that BNPP and its co-conspirators
engaged in a course of false or fraudulent conduct by making false
statements to obtain guarantees from the United States for
transactions that they knew they were not eligible for guarantees.
The United States alleges that when these transactions created
losses, BNPP made claims under the guarantees that BNPP knew were
false or fraudulent and thereby caused the USDA to pay BNPP money
that BNPP knew it was not entitled to receive.[53]  Accordingly, the

---

[53]United States' Complaint, Docket Entry No. 1, ¶¶ 27-50.

court is not persuaded by the BNPP defendants' contention that the claims underlying this action were not false.

> **(2)  The United States' Complaint Contains Enough Facts to Allege that the BNPP Defendants, Through Cruz, Knowingly Violated the FCA**

The BNPP defendants argue that the FCA claims fail because the United States "does not allege that any of BNPP's purportedly false statements were made 'knowingly.'"[54]   Asserting that "[t]he Complaint contains no allegations that BNPP acted 'knowingly,'"[55] the BNPP defendants argue that

> [a]mong the glaring omissions from the Complaint are any allegations that (1) any BNPP employee other than Cruz knew or approved of his corrupt misconduct, or (2) Cruz acted with the intent of for the purpose of benefitting his employer, BNPP, by his corrupt misconduct in taking bribes and deceiving BNPP.[56]

Citing United States v. Ridglea State Bank, 357 F.2d 495, 500 (5th Cir. 1966), the BNPP defendants argue that "[t]he Fifth Circuit has prohibited vicarious liability in circumstances materially identical to those here."[57]

In Ridglea a bank officer perpetrated a fraudulent scheme that involved approval of applications for loans insured by the Federal

---

[54]Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22-1, p. 17.

[55]Id. at 18.

[56]Id.

[57]Id. at 19.

Housing Authority ("FHA") while employed at two different banks. The officer knew that material representations in the borrowers' applications were false, and he personally received some of the proceeds of the loans as kickbacks from the borrowers. When the borrowers defaulted the banks sought to recover from the FHA, which paid some of the claims. The bank officer was indicted and pleaded guilty of making fraudulent loans. The United States subsequently sought to hold the two banks liable for the officer's fraudulent acts under the FCA. Ridglea, 357 F.2d at 496-97. The facts developed at trial established that "none of the employees in either bank except [the officer who had approved the loans] had actual knowledge of the falsity of the documents which accompanied the claims." Id. at 498. "The Government's case rest[ed] on imputing to the banks [the officer's] knowledge of the falsity of the documents, on the theory that he was acting as the agent of the banks at the time he approved the loans." Id. "The district court, sitting without a jury . . . gave judgment for both defendant banks on all of the counts which went to trial, primarily on the grounds that [the bank officer's] fraud could not properly be imputed to the banks." Id. at 497. The Fifth Circuit affirmed the district court's judgment, explaining that the bank officer's

> purpose was most certainly not to benefit his employer banks. He must have known that the loans he approved would be defaulted, so that the banks would not make any money on interest on the loans. And, as the trial court found, [the bank officer's] approval of fraudulent applications for FHA-insured loans endangered the bank's

> ability to continue to handle FHA business and
> jeopardized the reputation of the banks and their
> financial integrity. [The bank officer's] purpose, in
> fact, was to line his own pockets and those of his
> accomplices with the proceeds of the loans and to get
> money to make payments on loans previously approved by
> him on the basis of fraudulent applications, so that
> these earlier wrongdoings would remain concealed.

Id. at 498.

The BNPP defendants argue that like the bank officer in Ridglea, Cruz must have known that approval for disbursement of funds under guarantees that he knew had been obtained by the Exporters through false statements would jeopardized BNPP's reputation and financial integrity, and endanger BNPP's ability to continue to handle the SCGP and/or other USDA-related business. Moreover, the BNPP defendants argue that far from benefitting BNPP, Cruz's actions led to a substantial loss, a lengthy criminal investigation, and the institution of this civil action seeking $237 million ($79 million trebled). The BNPP defendants argue that "[i]n such circumstances, Cruz's knowledge cannot be imputed to BNPP as a matter of law.[58]

The BNPP defendants' reliance on Ridglea is misplaced for at least two reasons. First, Ridglea is distinguishable from this case because the facts on which both the district and circuit courts based their conclusions that the bank officer had not acted within the scope of his employment for the benefit of his employers were established during a trial and not, as here, merely alleged in

---

[58]Id. at 20-21.

-45-

a complaint challenged by a motion to dismiss prior to discovery. Second, the United States has alleged that unlike the bank officer in Ridglea, Cruz was acting within the scope of his employment and for the benefit of BNPP when he committed the acts at issue.  The United States' Complaint alleges that

> [a]s part of his responsibilities at BNP, Cruz was expected to develop new clients and business volume under the USDA Programs, such as SCGP, as well as increase business with existing clients, all for the benefit of BNP. As BNP's Manager of Trade Finance, Cruz negotiated with the U.S. Exporters for assignment of the SCGP guarantees and the promissory notes of the U.S. Importers, and was instrumental in establishing lines of credit for the U.S. Exporters through BNP's approval process.  By financing these transactions, BNP earned fees in exchange for providing a line of credit to U.S. Exporters that were fully secured by the United States. In acquiring and maintaining this business for BNP, Cruz acted within the scope of his employment and for the benefit of his employer, BNP.[59]

If true, these facts alleged in the United States' Complaint are capable of proving that when Cruz committed the acts underlying the United States' FCA claims he was acting within the scope of his employment and for the benefit of BNPP.  These facts are thus capable of establishing that the BNPP defendants, through Cruz, knowingly violated the FCA.  See Ridglea, 357 F.2d at 498-500 (acknowledging that guilty intent of an agent acting for the benefit of his employer will be imputed to the employer when the latter is sought to be held liable under a statute requiring knowledge or guilty intent).

---

[59]United States' Complaint, Docket Entry No. 1, p. 12 ¶ 44.

**(3)  The United States' Complaint Fails to Plead
        Fraud with Particularity**

The BNPP defendants argue that the United States' Complaint

fails to plead fraud with particularity as required by Rule 9(b),

because "Plaintiff fails to 'set forth the who, what, when, where,

and how of the alleged fraud.'"[60]  The BNPP defendants assert that

> First, Plaintiff does not attempt to distinguish between
> the alleged conduct of the three defendants (BNP Paribas,
> BNPP NA, and BNPP Houston), but rather groups them into
> one entity, using "BNP" throughout the Complaint.
> Second, Plaintiff alleges that Cruz was an employee of
> BNP Houston (Compl. ¶ 15) but fails to provide any basis
> to impute his actions to BNP Paribas or BNPP NA.  Third,
> Plaintiff does not identify with specificity who it
> believes made false statements to the government, what
> these statements were, or where, and to whom they were
> made.  See Compl. ¶¶ 34, 42.  Fourth, Plaintiff provides
> no details related to the nature of the agreements, when
> they were formed, or the parties to them.[61]

In response to the BNPP defendants' assertion that the

Complaint does not attempt to distinguish between the alleged

conduct of the three BNPP defendants, the United States argues that

it has alleged that

> each of the three BNPP defendants participated equally in
> the fraud because the MPSAs with the Exporters, the
> guarantee assignments, and the actual claims submitted to
> the USDA were executed interchangeably among the three
> defendants such that their differences, if any, cannot be
> discerned at this time.[62]

---

[60]Memorandum of Points and Authorities in Support of BNPP's
Motion to Dismiss, Docket Entry No. 22-1, p. 23 (citing
United States ex rel. Doe v. Dow Chemical Co., 343 F.3d 325, 328
(5th Cir. 2003)).

[61]Id.

[62]United States' Opposition to BNPP's Motion to Dismiss, Docket
Entry No. 32, p. 24.

The United States has not cited the paragraphs of the Complaint in which these allegations are made, and the court has not found them. The United States' Complaint contains a Table that lists the date each of the guarantees was approved by the CCC, the date the CCC received BNP's claims on each guarantee, the date the CCC paid BNP on each guarantee, and the amount paid on each guarantee; but the Table does not identify which of the BNPP defendants accepted the assignment of each guarantee, submitted the claim on each guarantee, and/or received payment on each guarantee. Accordingly, the court is not persuaded that the Complaint adequately distinguishes between the allegedly fraudulent conduct of the three BNPP defendants. See United States ex rel. Russell v. Epic Healthcare Management Group, 193 F.3d 304, 308 (5th Cir. 1999) ("The conduct to which liability attaches in a False Claims Act suit consists in part of false statements or claims for payment presented to the government . . . Because such statements or claims are among the circumstances constituting fraud in a False Claims Act suit, these must be pled with particularity under Rule 9(b)."), abrogated on other grounds by United States es rel. Eisenstein v. City of New York, New York, 129 S.Ct. 2230, 2233 n.1 (2009). See also United States ex rel. Hebert v. Dizney, 295 Fed.Appx. 717, 722 (5th Cir. 2008) (recognizing the need for plaintiffs in FCA cases with multiple corporate defendants to plead with particularity the identity of corporate actors making the misrepresentations).

-48-

In response to the BNPP defendants' assertion that the United States alleges that Cruz was an employee of BNP Houston (Compl. ¶ 15), but fails to provide any basis to impute Cruz's actions to BNP Paribas or BNPP NA, the United States argues that "Cruz's actions and knowledge are attributable to BNPP because at all times he was acting with actual and apparent authority from BNPP, on its behalf and for its benefit."[63]   Because the United States has alleged that Cruz was employed by BNPP Houston, but has not alleged that Cruz was employed by either of the other two BNPP entities named as defendants in this action, i.e., BNPP and BNPP North America, the court is not persuaded that the Complaint adequately alleges facts capable of holding either of these two entities vicariously liable for Cruz's actions.   See Grubbs, 565 F.3d at 192  (discussing the need for plaintiffs in FCA cases to plead with particularity the basis on which corporate defendants are alleged to be held vicariously liable).

In response to the BNPP defendants' assertion that the United States has failed to identify with particularity who it believes made false statements to the government, what these statements were, or when, where, and to whom they were made, the United States cites the Complaint at ¶ 34 as evidence of allegations that "identif[y] precisely who was responsible for the false statements of eligibility being submitted to the USDA,"[64] and

---

[63]Id.

[64]Id. at 25.

¶ 48 as evidence of allegations that "Cruz, BNPP and their co-conspirators submitted the false claims to the USDA and the exact dates on which those claims were received."[65]  Because neither the allegations made in ¶ 34 nor those made in ¶ 48 of the Complaint distinguish which of the defendants are responsible for false statements of eligibility, or which of the defendants obtained and/or submitted guarantees to the USDA for payment, the court is not persuaded that the facts alleged in either of these two paragraphs adequately distinguish between the allegedly fraudulent conduct of the named defendants.

In response to the BNPP defendants' assertion that the United States fails to provide details related to the nature of the agreements the defendants allegedly made, when these agreements were made, or which parties made them, the United States acknowledges that the Complaint does not recite all of the terms and conditions of the relevant agreements at issue in this case, but asserts that "each of the agreements is identified: the MPSAs between BNPP and the Exporters (Compl. ¶¶ 27-34); the guarantees between BNPP and the USDA and the claims made thereon (Compl. ¶ 48).  Surely, the BNPP defendants are on notice of the facts alleged against them."[66]  Because -- like the allegations regarding the guarantees and the submission of the guarantees for payment

---

[65]Id.

[66]Id.

made in ¶ 48 of the Complaint -- the allegations made in ¶¶ 27-34 of the Complaint fail to distinguish which of the three BNPP defendants engaged in the acts alleged, the court is not persuaded that the allegations made in these paragraphs are pleaded with the particularity required by Rule 9(b). See Grubbs, 565 F.3d at 192. Accordingly, the court concludes that the United States' Complaint fails to satisfy Rule 9(b)'s particularity requirement for claims that sound in fraud.

### 2. United States' Common Law Claims Are Not Legally Flawed

The BNPP defendants argue that the United States' common law claims for unjust enrichment and payment by mistake are "foreclosed by the existence of a valid, express contract."[67] Asserting that "[t]he SCGP regulations explain that the guarantees assigned to BNPP are contracts,"[68] the BNPP defendants argue that "[t]he existence of these payment guarantee contracts . . . forecloses [the United States' resort to alternative equitable theories of relief."[69] The BNPP defendants explain that

> [w]ith respect to unjust enrichment, no "quasi-contract will be found where an express contract exists." *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 454 (5th Cir. 2001). Likewise, a claim for so-called payment by mistake is precluded where the payment is made pursuant

---

[67]Memorandum of Points and Authorities in Support of BNPP's Motion to Dismiss, Docket Entry No. 22-1, p. 23.

[68]Id. at 24.

[69]Id.

-51-

to a contract because it is no mistake at all. *See,
e.g., United States v. First Choice Armor & Equipment,
Inc.,* 2011 WL 3799544, at *7 (D.D.C. Aug. 29, 2011)
(Ex. 22) ("Allegations in a complaint that an express
contract existed between the parties . . . preclude a
plaintiff from proceeding on alternative theories of FCA
liability and unjust enrichment or payment by
mistake.").[70]

Alternatively, the BNPP defendants argue that the United States'
common law claims "fail as a matter of law because equity dictates
that Plaintiff must bear the loss of alleged fraudulent scheme
because BNPP is an innocent third party."[71]

These arguments fail because the United States has a
longstanding power, independent of any statute, to recover monies
its agents have wrongfully, erroneously, or illegally paid out
pursuant to the federal common law doctrines of unjust enrichment
and/or payment by mistake. See <u>United States v. Wurts</u>, 58 S.Ct.
637, 638 (1938); <u>LTV Education System, Inc. v. Bell</u>, 862 F.2d 1168,
1175 (5th Cir. 1989). Moreover, since parties may plead
alternative and inconsistent theories of recovery, a motion to
dismiss is not the appropriate vehicle for determining whether the
guarantees preclude claims for unjust enrichment and/or payment by
mistake. In <u>United States v. Applied Pharmacy Consultants, Inc.</u>,
182 F.3d 603 (8th Cir. 1999), the Eighth Circuit affirmed a
judgment for the United States on unjust enrichment claims despite
the presence of a claimed contract. The court explained that

---

[70]<u>Id.</u> at 23-24.

[71]<u>Id.</u> at 25. <u>See also</u> BNPP's Reply, Docket Entry No. 37,
p. 15.

the rules of common law, especially rules which concern
forms of pleading, should never be taken beyond the
reason which gave them birth.  The reason for the rule
that someone with an express contract is not allowed to
proceed on an unjust-enrichment theory, is that such a
person has no need of such a proceeding, and, moreover,
that such a person should not be allowed by means of such
a proceeding to recover anything more or different from
what the contract provides for.  Here, that reason does
not apply, and therefore the rule should not apply.

Id. at 608.  Alternatively, the defendants' arguments fail because
the United States has pleaded facts capable of establishing that
the payment guarantee contracts, which the BNPP defendants argue
foreclose the United States' common law claims, are void because
they were tainted by fraud, bribes, and/or kickbacks.  See
United States v. Mississippi Valley Generating Co., 81 S.Ct. 294
(1961) (finding that government contracts tainted by fraud or
wrong-doing are unenforceable); United States v. Acme Process
Equipment Co., 87 S.Ct. 350, 355-56 (1966) (the government may
rescind a contract tainted by kickbacks).  The regulations that
govern the SCGP provide that recipients and assignees of SCGP
guarantees are subject to cancellation in the event of fraud or bad
faith in the course of application or certification as alleged
here.  See 7 C.F.R. §§ 1493.430(c), 1493.510(e), 1493.520(d), and
1493.520(e).

## IV.  Conclusions and Order

For the reasons explained above, the Motion to Dismiss the
Complaint by Defendants BNP Paribas, BNP Paribas North America,
Inc., and BNP Paribas Houston Agency (Docket Entry No. 22) is

**GRANTED in PART and DENIED in PART.**   Defendant Jovenal Miranda Cruz's Motion to Adopt in Part Motion to Dismiss Complaint by BNPP (Docket Entry No. 25) is **DENIED.**   The United States shall file an amended complaint within thirty (30) days stating with particularity facts showing how and why each of the three BNPP entities may be held liable for the claims asserted in this action.

As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. When appropriate the court will consider motions for summary judgment, but additional motions to dismiss pursuant to Rule 12(b)(6) will not be considered.

**SIGNED** at Houston, Texas, on this the 6th day of August, 2012.

SIM LAKE
UNITED STATES DISTRICT JUDGE