UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
| ) | |
| Plaintiff,      ) | |
| ) | |
| v.      ) | |
| ) | |
| BNP PARIBAS SA; BNP PARIBAS NORTH      ) | Civil Action No. 4:11cv3718 |
| AMERICA; BNP PARIBAS HOUSTON      ) | |
| AGENCY; and JOVENAL MIRANDA CRUZ,      ) | Jury Trial Requested |
| ) | |
| ) | |
| Defendants.      ) | |
| ) | |

## UNITED STATES' FIRST AMENDED COMPLAINT

The United States of America ("United States"), for its complaint, alleges as follows:

## INTRODUCTION

1.    This is an action by the United States for treble damages and civil penalties against defendants BNP Paribas SA, BNP Paribas North America, BNP Paribas Houston Agency, and Jovenal Miranda Cruz a.k.a. Jerry M. Cruz ("Cruz") (collectively "defendants"), for violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733; against defendants BNP Paribas SA, BNP Paribas North America, BNP Paribas Houston Agency and Cruz for damages for the common law and equitable claims of unjust enrichment; and against defendants BNP Paribas SA, BNP Paribas North America, and BNP Paribas Houston Agency for damages for the common law and equitable claims of payment by mistake.

2.      In this action, the United States alleges that from 1998 through 2006 (the "Relevant Time Period"), BNP Paribas, BNP Paribas North America, and BNP Paribas Houston Agency, and their former Vice President, Jerry M. Cruz, engaged in a scheme to defraud the United States in connection with commodity payment guarantees provided by the U.S. Department of Agriculture ("USDA") under its Supplier Credit Guarantee Program ("SCGP"). Under the SCGP, USDA provided payment guarantees to U.S.-based exporters on their sales of grain and other commodities to commodity purchasers/importers in Mexico, and which guarantees the U.S.-based exporters then assigned to BNP Paribas SA.  The regulations governing the SCGP made clear that an exporter was ineligible to obtain SCGP payment guarantees for commodity sales to any foreign purchaser/importer with which it was under common ownership and/or control.

3.      The scheme involved at least four U.S.-based commodity export companies ("U.S. Exporters") and at least four Mexican companies ("Mexican Importers"), all under the common ownership and/or control of Fernando Pablo Villarreal Cantu ("Villarreal"), a citizen of Mexico.  The U.S. Exporters are: Laredo Grain Company ("Laredo Grain"); Mid-Valley Grain Company ("Mid-Valley Grain"); U.S.A. Meat & Grain Company ("U.S.A. Meat & Grain"); and Alamo Feeders, Inc. ("Alamo Feeders").  The Mexican Importers are: Internacional Grain S.A. de C.V. ("Internacional Grain"); Central de Granos de la Laguan S.A. de C.V. ("Central de Granos"); Compania Ganadera Vi-Ba Hnos., S.A. de C.V ("Compania Ganadara"); and Granos Rolados S.A. de C.V. ("Granos Rolados").

4.      BNP Paribas SA entered into agreements with each of the U.S. Exporters to accept assignment of commodity guarantees issued to the U.S. Exporters under the SCGP in

exchange for a fee, plus the U.S.-backed guaranteed payment on each commodity sale.  During the Relevant Time Period, the U.S. Exporters applied for and obtained USDA payment guarantees under the SCGP for commodity shipments to the Mexican Importers, and in accordance with their agreements with BNP Paribas SA, assigned the payment guarantees on their commodity exports to BNP Paribas SA.  Because the U.S. Exporters and Mexican Importers were under common ownership and/or control, which fact defendants knew, none of the commodity sales between these entities were eligible for SCGP payment guarantees.  Moreover, many of the commodity transactions between the U.S. Exporters and Mexican Importers were entirely fictitious, with no shipment of the commodity ever taking place.  When the Mexican Importers defaulted on their payment obligations for their commodity purchases, BNP Paribas SA, BNP Paribas North America, BNP Paribas Houston Agency, and Cruz presented, or caused to be presented, false or fraudulent claims to USDA on commodity payment guarantees issued pursuant to the SCGP, and did so knowing that none of the transactions were eligible for the guarantees because the U.S. Exporters and the Mexican Importers involved were commonly owned and/or controlled.

5.      Several individuals who had a working role in one or more of the export companies and participated in the conspiracy, were indicted in the Southern District of Texas in March 2010.  The indicted individuals are: Cruz; Fernando Pablo Villarreal Cantu ("Villarreal"); Robert Wayne See ("See"); Jorge Eduardo Gonzalez Pizana ("Gonzalez"); Javier Heriberto Hinojosa ("Hinojosa"); and Joel Villalon ("Villalon").

6.      The defendants' actions, along with those of their co-conspirators, subverted the goals, purposes, and operations of the SCGP, and caused damage to the United States.

3

7.    As more fully set forth below, during the Relevant Time Period, between 1998 and 2006, the defendants and their co-conspirators made and used false statements and fraudulent means to wrongfully obtain SCGP guarantees and payments thereunder.

## JURISDICTION AND VENUE

8.    The Court has jurisdiction over this matter pursuant to 31 U.S.C. §§ 3729-3733, and 28 U.S.C. §§ 1331, 1345, and 1355, and its general common law and equitable jurisdiction.

9.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1395 because a substantial part of the events giving rise to the claims herein occurred in this District, and pursuant to 31 U.S.C. § 3732(a) because at least one of the defendants can be found, resides, or transacts business in this District.

## THE PARTIES

10.    Plaintiff is the United States of America, suing on behalf of the United States Department of Agriculture ("USDA"), an agency of the United States of America, the Foreign Agricultural Service ("FAS"), a subagency of the USDA, and the Commodity Credit Corporation ("CCC"), a federally chartered corporation within USDA.  The CCC was created to stabilize, support, and protect farm income and prices.  The CCC also helps to maintain balanced and adequate supplies of agricultural commodities and aids in their orderly distribution.  During the Relevant Time Period, the SCGP was under the general administrative responsibility of the General Sales Manager of the FAS.  The USDA, CCC, and FAS are sometimes collectively referred to in this Complaint as "USDA."

4

11.    Defendant BNP Paribas SA ("BNP Paribas") is a French public limited company doing business in the United States in the State of Texas, and more particularly within the geographical limits of the United States District Court, Southern District of Texas.  BNP Paribas resulted from the merger of Banque Nationale de Paris and Paribas Bank in or about 2000 (the "Merger").  BNP Paribas conducted SCGP business through its agent, BNP Paribas, Houston Agency, and with the knowledge and approval of its subsidiary BNP Paribas NA.

12.    Defendant BNP Paribas North America, Inc. ("BNP Paribas NA"), a wholly owned subsidiary of BNP Paribas, is a U.S. financial services corporation incorporated in Delaware, and doing business in the State of Texas, and more particularly within the geographical limits of the United States District Court, Southern District of Texas.  BNP Paribas NA is headquartered in New York, NY.  On behalf of BNP Paribas, BNP Paribas NA conducted SCGP business through its own employees and by authorizing the activities of the employees of BNP Paribas, Houston Agency.

13.    BNP Paribas, Houston Agency, a wholly owned subsidiary of BNP Paribas NA, is a Texas corporation, doing business in the State of Texas, and more particularly within the geographical limits of the United States District Court, Southern District of Texas.  BNP Paribas, Houston Agency, during the relevant time period, conducted SCGP business on behalf of BNP Paribas, as its agent, and with the express approval of BNP Paribas NA.

14.    In carrying out their SCGP business, BNP Paribas, BNP Paribas NA and BNP Paribas, Houston Agency used the name "BNP Paribas" interchangeably in their communications, corporate contracts, accounts, and everyday business documents such that the full extent of their individual acts cannot be discerned at this time.  Defendants BNP Paribas,

5

BNP Paribas NA, and BNP Paribas, Houston Agency, and their predecessors and successors, subsidiaries, affiliates or assigns, shall sometimes be referred to collectively as "BNP."

15.     Defendant Jovenal Miranda Cruz a.k.a. Jerry M. Cruz ("Cruz") was a BNP Vice President working at BNP Paribas, Houston Agency.  Upon information and belief, Cruz was employed by BNP Paribas, Houston Agency, which reported directly to BNP Paribas NA.  Cruz was a BNP Manager of Trade Finance during the Relevant Time Period in the area of general corporate banking.  Upon information and belief, Cruz currently resides in the State of Texas. As Manager of Trade Finance, Cruz was instrumental in establishing lines of credit to the U.S. Exporters through the BNP approval process.  The approval process for the lines of credit to these particular clients originated out of BNP Paribas, Houston Agency, while approval for the various requests came from BNP Paribas NA.  Ultimate authority for the relationships and the lines of credit came from BNP Paribas.  As part of his responsibilities, Cruz was expected to develop new clients and business volume under the USDA Programs, such as SCGP, as well as increase business with existing clients, all for the benefit of BNP Paribas, Houston Agency, BNP Paribas NA, and BNP Paribas.

16.     The Court has personal jurisdiction over the defendants by reason of their actions described below.

## The False Claims Act

17.     The FCA, at 31 U.S.C. § 3729(a)(1), provides that a person is liable to the United States Government for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."

6

18.     As amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), the false statements provision of the FCA makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009).

19.     The FCA further provides, at 31 U.S.C. § 3729(a)(3), that a person is liable to the United States Government if the person "conspires to commit a violation" of the FCA.

20.     At 31 U.S.C. § 3729(b), the FCA defines the term "knowingly" to mean that a person, with respect to information: "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information"; and further provides that no proof of specific intent to defraud is required.

## FACTUAL ALLEGATIONS

### Program Background

21.     During the Relevant Time Period, the SCGP was an export credit guarantee program administered by the USDA Foreign Agricultural Service ("FAS").  The regulations that govern the SCGP are set forth at 7 C.F.R. § 1493.  The SCGP was designed to make credit available to U.S.-based exporters to finance commercial exports of U.S. agricultural products to eligible countries, while providing competitive credit terms to foreign purchasers of U.S. agricultural commodities.

22.     Under the SCGP, U.S. exporters could sell U.S. agricultural commodities to foreign importers on credit partially guaranteed by the CCC.  The direct credit extended by the U.S. exporter to the foreign importer had to be secured by a dollar denominated promissory note

7

signed by the foreign importer in favor of the U.S. exporter, and had to require payment in full within 180 days.  To obtain a payment guarantee from CCC under the SCGP, a qualified exporter had to apply for the guarantee before the date of the export.  Exporters were required to pay a fee for the guarantee.

23.     Under the SCGP, the U.S. exporter could obtain access to financing – such as a line of credit – before the foreign importer's payment on the commodity purchase was due, by assigning both the foreign importer's promissory note and the exporter's rights to payment under CCC's guarantee to a financial institution, such as BNP Paribas.

24.     The guarantee offered by CCC under the SCGP guaranteed payment by USDA to the U.S. exporters of up to 65 percent of the expected export value at the time of the application process, or 65 percent of the actual shipment value, if that is less, of a U.S. agricultural commodity purchased by an eligible foreign importer from an eligible U.S. exporter.

25.     Pursuant to federal regulation, an exporter of U.S. agricultural commodities was ineligible to participate in the SCGP if the exporter was directly or indirectly owned or controlled by the importer or by a person or entity which also owned or controlled the importer. Further, the exporter was not eligible to participate in the SCGP if the exporter directly or indirectly owned the importer.  Thus, a material requirement to qualify for the SCGP was that the exporter must have negotiated the terms of the export credit sale with an unrelated foreign importer to export an eligible U.S. commodity.

26.     Under the SCGP, where the exporter had assigned the CCC guarantee to a financial institution, the financial institution could submit a claim to CCC and collect on the guarantee from the CCC in the event an importer failed to make payment on the commodities.

8

**The Scheme**

27.    During the Relevant Time Period, from in or about 1998, and continuing through

on or about December 31, 2006, defendants conspired to and in fact did violate the FCA by

getting false and fraudulent claims allowed or paid, and knowingly presenting, or causing to be

presented, false or fraudulent claims for payment or approval and knowingly making, using, or

causing to be made or used, false records or statements material to false or fraudulent claims.

Defendants carried out this conspiracy as described by the following paragraphs.

28.    Beginning on or about 1998 and continuing throughout the Relevant Time Period,

as part of their scheme to submit false or fraudulent claims to the United States, BNP Paribas

entered into and maintained a series of Master Purchase and Sale Agreements ("MPSAs") with

each of the U.S. Exporters: Laredo Grain, Mid-Valley Grain, U.S.A. Meat & Grain and Alamo

Feeders.  The MPSAs established the mechanism through which BNP Paribas, BNP Paribas NA,

BNP Paribas, Houston Agency, and Cruz participated in and generated profits for themselves

through the SCGP.

29.    Prior to the Merger, the MPSAs were entered into by Banque Nationale de Paris,

acting through its Houston unincorporated branch. After the Merger, subsequent MPSAs were

entered into by BNP Paribas, sometimes referred to as "a bank organized under the laws of

France," acting through its Houston unincorporated branch.  Upon information and belief, BNP

Paribas assumed all rights and responsibilities of Banque Nationale de Paris in connection with

the MPSAs executed before the Merger.

30.    Each of the MPSAs with the U.S. Exporters provided that BNP would receive

profits on the export sales transactions of the U.S. Exporters that were guaranteed by the USDA

9

under the SCGP.  Pursuant to the MPSAs, BNP only agreed to participate in export sale

transactions that were, in fact, guaranteed by the USDA under the SCGP.

31.     On October 27, 1998, BNP Paribas entered into an MPSA, acting through its

Houston Agency, with U.S.A. Meat & Grain, one of the U.S. Exporters.  According to its terms,

this MPSA applied to BNP Paribas' purchase of accounts representing rights to payment in

connection with sales of eligible commodities from U.S.A. Meat & Grain to Internacional Grain,

one of the Mexican Importers, **which sales were guaranteed by the CCC under the SCGP**.

BNP Paribas purchased these rights for an amount equal to the guarantee value of the sale less

the product of the Prime Rate of interest charged by BNP Paribas on the date of purchase

multiplied by the guarantee value, divided by two.  Pursuant to the terms of the MPSA, BNP

Paribas retained for its benefit the right to conduct investigations of the importer and the

transaction giving rise to the sale, including verification that the importer is satisfied with the

goods and credit searches on the importer.  The MPSA was executed by Jerry M. Cruz, Vice

President, on behalf of BNP Paribas.

32.     On November 16, 1999, BNP Paribas, acting through its Houston Agency,

entered into an MPSA with Mid-Valley Grain, one of the U.S. Exporters.  According to its terms,

this MPSA applied to BNP Paribas' purchase of accounts representing rights to payment in

connection with sales of eligible commodities from Mid-Valley Grain to Central De Granos, one

of the Mexican Importers, **which sales were guaranteed by the CCC under the SCGP**.  BNP

Paribas purchased these rights for an amount equal to the guarantee value of the sale less the

product of the Prime Rate of interest charged by BNP Paribas on the date of purchase multiplied

by the guarantee value, divided by two.  Pursuant to the terms of the MPSA, BNP Paribas

retained for its benefit the right to conduct investigations of the importer and of the transaction giving rise to the sale, including verification that the importer is satisfied with the goods and credit searches on the importer.  The MPSA was executed by Aurora L. Abella, Vice President, on behalf of BNP Paribas.

33.      On March 8, 2001, BNP Paribas, acting through its Houston Agency, entered into an MPSA with Alamo Feeders, one of the U.S. Exporters.  According to its terms, this MPSA applied to BNP Paribas' purchase of accounts representing rights to payment in connection with sales of eligible commodities from Alamo Feeders to Compania Ganadera, one of the Mexican Importers, **which sales were guaranteed by the CCC under the SCGP**.  BNP Paribas purchased these rights for an amount equal to the guarantee value of the sale less the product of the Prime Rate of interest charged by BNP Paribas on the date of purchase multiplied by the guarantee value, divided by two.  Pursuant to the terms of the MPSA, BNP Paribas retained for its benefit the right to conduct investigations of the importer and of the transaction giving rise to the sale, including verification that the importer is satisfied with the goods and credit searches on the importer.  The MPSA was executed by Jerry Cruz, on behalf of BNP Paribas.  A signature that appears to be that of Aurora L. Abella, Vice President, is likewise on the signature line for BNP Paribas.

34.      On October 27, 2004, BNP Paribas, acting through its Houston Agency, entered into an MPSA with Laredo Grain, one of the U.S. Exporters.  According to its terms, this MPSA applied to BNP Paribas' purchase of accounts representing rights to payment in connection with sales of eligible commodities from Alamo Feeders to Granos Rolados, one of the Mexican Importers, **which sales were guaranteed by the CCC under the SCGP**.  BNP Paribas

11

purchased these rights for an amount equal to the guarantee value of the sale less the product of the Prime Rate of interest charged by BNP Paribas on the date of purchase multiplied by the guarantee value, divided by two.  Pursuant to the terms of the MPSA, BNP Paribas retained for its benefit the right to conduct investigations of the importer and of the transaction giving rise to the sale, including verification that the importer is satisfied with the goods and credit searches on the importer.  The MPSA was executed by Jerry M. Cruz, Vice President, on behalf of BNP Paribas.

35.     It was thus BNP Paribas, acting through the Houston Agency, that entered into each of the MPSAs with the Exporters.

36.     In accordance with the MPSAs, during the Relevant Time Period, each of the U.S. Exporters, with the knowledge of their co-conspirators, including BNP Paribas, BNP Paribas NA, BNP Paribas, Houston Agency, and Cruz, applied to the CCC for guarantees of U.S. agricultural commodity sales to their respective Mexican Importers pursuant to the SCGP. Between July 2004 and February 2005, defendants and their co-conspirators falsely and/or fraudulently obtained guarantees from the CCC pursuant to the SCGP; guarantees that eventually were collected on by BNP Paribas, BNP Paribas NA, and BNP Paribas, Houston Agency, resulting from the Mexican Importers' default on their payment obligations.  The dates of these guarantees are set forth below in Paragraph 51.

37.     Each of the U.S. Exporters – U.S.A. Meat & Grain, Mid-Valley Grain, Alamo Feeders, and Laredo Grain – were owned and/or controlled by Villarreal.

38.     Each of the Mexican Importers – Internacional Grain, Central de Granos, Compania Ganadara, and Granos Rolados – were owned and/or controlled by Villarreal.

12

39.     Villarreal exercised control and authority over each of the U.S. Exporters and the Mexican Importers throughout the Relevant Time Period.

40.     Because of the explicit and material regulatory requirements of the SCGP, the U.S. Exporters were ineligible to receive SCGP loan guarantees for sales to the related Mexican Importers.

41.     Although the transactions were not eligible under the SCGP, in accordance with the MPSAs, BNP Paribas, BNP Paribas NA, BNP Paribas, Houston Agency, Cruz and their co-conspirators, created and used false and fraudulent promissory notes purporting to document a financial obligation between and among a qualified exporter, a qualified importer, and a related financial institution.  BNP Paribas entered into each of these transactions, with the benefit of its MPSAs, and through its Houston Agency.  BNP Paribas NA approved each of these transactions.

42.     In each instance, and in accordance with the MPSAs, upon the receipt of a guarantee from CCC, the U.S. Exporter assigned the CCC guarantee to BNP Paribas at its Houston address, along with the payment obligation from the Mexican Importer.  In exchange therefor, BNP Paribas provided a line of credit (up to the amount of the guarantee) to the U.S. Exporter (minus the amount of money BNP Paribas charged for the business).  The Assignment to BNP Paribas was received with the full knowledge, approval and participation of BNP Paribas NA and BNP Paribas, Houston Agency.  The Assignment Notification to CCC, evidencing the assignment to BNP Paribas of the U.S. Exporters' rights, title, and interest in and to any amounts payable under the payment guarantee, included a certification from BNP Paribas (at its Texas address for BNP Paribas, Houston Agency) that it "is a U.S. Bank or financial institution."

13

43.     Because each of these transactions violated material requirements prohibiting identity of control between importers and exporters, each transaction resulted in a falsely or fraudulently obtained guarantee from the CCC.  Moreover, in some instances, defendants and their co-conspirators obtained fraudulent guarantees for commodity transactions that did not even exist, with no shipment of the commodity ever taking place.

44.     Defendants and their co-conspirators knowingly concealed from the USDA the U.S. Exporters' and Mexican Importers' ineligibility to participate in the SCGP due to the ownership and/or control of both the exporters and importers by Villarreal.

45.     Defendants and their co-conspirators knowingly concealed from the USDA the fact that the grain transactions between the U.S. Exporters and their respective Mexican Importers were not arms-length transactions.

46.     As part of his responsibilities, Cruz was expected to develop new clients and business volume under the USDA Programs, such as SCGP, as well as increase business with existing clients, all for the benefit of BNP Paribas, BNP Paribas NA, and BNP Paribas, Houston Agency.  As BNP's Manager of Trade Finance, using the BNP Paribas MPSAs, Cruz negotiated with the U.S. Exporters for assignment of the SCGP guarantees and the promissory notes of the U.S. Importers, and was instrumental in establishing lines of credit for the U.S. Exporters from BNP Paribas, and through BNP Paribas' and BNP Paribas NA's approval process.  By financing these transactions, BNP Paribas, BNP Paribas NA, and BNP Paribas, Houston Agency earned fees in exchange for providing a line of credit to the U.S. Exporters that was fully secured by the United States.  In acquiring and maintaining this business, Cruz acted within the scope of his employment and for the benefit of his employer, BNP Paribas, Houston Agency, as well as its

14

parent BNP Paribas and BNP Paribas, NA, the entity to which Cruz and the BNP Paribas,

Houston Agency employees directly reported.

47.     Defendants and their co-conspirators knew that the guarantees described above

were falsely and/or fraudulently obtained because the U.S. Exporters and Mexican Importers

were related parties and ineligible for an SCGP guarantee in conjunction with the proposed

transactions.  Cruz solicited and received payments of kickbacks and/or bribes from Villarreal

directly, and through others in the conspiracy, for BNP's role in financing the scheme through

expanding lines of credit from BNP Paribas to the U.S. Exporters based on ineligible commodity

sales to the Mexican Importers.

48.     BNP Paribas, Houston Agency, BNP Paribas NA, BNP Paribas, and Cruz signed

off on and approved lines of credit for each of the U.S. Exporters and allowed the co-

conspirators to withdraw funds on lines of credit, thereby increasing the exposure and ultimate

liability of the CCC on the falsely obtained guarantees.

49.     Cruz, who worked out of BNP Paribas, Houston Agency, developed the SCGP

business at issue.  It was conducted primarily out of BNP Paribas, Houston Agency, on behalf of

BNP Paribas.  All steps taken in connection with the SCGP business was reported to and

authorized by BNP Paribas NA.  Individuals from BNP Paribas, Houston Agency prepared credit

proposals and authorizations for approvals of new clients (U.S. Exporters), for approval by

BNP's credit committee maintained by BNP Paribas NA (the "Client Acceptance Committee" or

"CAC").  The clients and credit lines involved in this SCGP business required authority from

BNP Paribas NA to carry out the business.  The Comite de Paris was the senior most credit

committee, part of BNP Paribas and located in Paris.  Upon information and belief, certain

15

authorizations and/or approvals of the SCGP business were obtained from the Comite de Paris.
In all instances BNP Paribas was kept informed of BNP Paribas NA's credit authorizations and
approvals for all credit facilities and relationships connected with the Houston SCGP portfolio.

50.     During the Relevant Time Period, beginning in or about April 2005, the Mexican
Importers began to default on their payment obligations guaranteed by the CCC.   BNP Paribas,
BNP Paribas NA, BNP Paribas, Houston Agency, and Cruz knew that these underlying
transactions were ineligible for guarantees under the SCGP.

51.     As the Mexican Importers defaulted on their payment obligations, BNP Paribas,
BNP Paribas NA, BNP Paribas, Houston Agency, Cruz and their co-conspirators submitted or
caused to be submitted at least the following claims to the CCC on commodity payment
guarantees, pursuant to the SCGP, totaling more than $78 million, and which were then paid by
the CCC, as set forth in the Table.  The Table lists the date each of the guarantees was approved
by CCC, the date CCC received BNP's claims on each guarantee, the date CCC paid BNP
Paribas on the guarantee, and the payment amount of the guarantee.  Each of the claims was
prepared by employees of BNP Paribas NA and BNP Paribas, Houston Agency, with the full
knowledge and approval of BNP Paribas.  Each of the claims was submitted on under the name
"BNP Paribas," signed by individuals employed by BNP Paribas, Houston Agency, under the
direct supervision and instruction of BNP Paribas NA, and with the full knowledge and approval
of BNP Paribas.  Each of the claims was submitted on "BNP Paribas" letterhead, using a website
address of BNP Paribas (bnpparibas.com), and required payment to "BNP Paribas New York,
NY" (at an address in New York) into an account titled "BNP Paribas."

| Guarantee Approval Date | Received | Paid | Total | |
|---|---|---|---|---|
| 7/18/2004 | 04/22/05 | 06/07/05 | $ | 1,153,382.83 |
| 7/18/2004 | 04/22/05 | 06/07/05 | $ | 576,269.87 |
| 7/31/2004 | 04/25/05 | 06/07/05 | $ | 328,754.40 |
| 10/18/2004 | 04/22/05 | 06/07/05 | $ | 698,868.95 |
| 10/18/2004 | 04/22/05 | 06/07/05 | $ | 140,296.49 |
| 10/18/2004 | 04/22/05 | 06/07/05 | $ | 210,522.25 |
| 7/31/2004 | 06/21/05 | 08/26/05 | $ | 509,640.49 |
| 7/31/2004 | 04/22/05 | 08/26/05 | $ | 19,915.43 |
| 7/31/2004 | 04/22/05 | 08/26/05 | $ | 499,281.48 |
| 9/21/2004 | 04/25/05 | 08/29/05 | $ | 429,798.52 |
| 9/21/2004 | 04/25/05 | 08/29/05 | $ | 106,887.25 |
| 9/21/2004 | 04/25/05 | 08/29/05 | $ | 21,363.18 |
| 9/21/2004 | 05/11/05 | 08/29/05 | $ | 201,282.54 |
| 9/21/2004 | 05/11/05 | 08/29/05 | $ | 413,958.65 |
| 9/21/2004 | 04/25/05 | 08/29/05 | $ | 21,378.19 |
| 10/21/2004 | 05/02/05 | 08/29/05 | $ | 226,123.02 |
| 10/21/2004 | 05/02/05 | 08/29/05 | $ | 528,451.01 |
| 10/21/2004 | 05/02/05 | 08/29/05 | $ | 36,566.77 |
| 10/21/2004 | 05/18/05 | 08/29/05 | $ | 62,601.50 |
| 10/21/2004 | 05/02/05 | 08/29/05 | $ | 31,945.98 |
| 10/21/2004 | 05/02/05 | 08/29/05 | $ | 38,369.03 |
| 10/21/2004 | 05/02/05 | 08/29/05 | $ | 121,625.06 |
| 10/21/2004 | 05/02/05 | 08/29/05 | $ | 45,707.29 |
| 10/21/2004 | 05/02/05 | 08/29/05 | $ | 31,260.18 |
| 10/21/2004 | 05/02/05 | 08/29/05 | $ | 41,892.78 |
| 7/18/2004 | 04/25/05 | 08/30/05 | $ | 109,458.38 |
| 7/18/2004 | 05/02/05 | 08/30/05 | $ | 168,270.96 |
| 10/21/2004 | 05/02/05 | 08/30/05 | $ | 64,126.59 |
| 10/21/2004 | 04/25/05 | 08/30/05 | $ | 65,428.32 |
| 10/21/2004 | 04/25/05 | 08/30/05 | $ | 813,340.44 |
| 10/21/2004 | 04/29/05 | 08/30/05 | $ | 176,525.35 |
| 10/21/2004 | 05/11/05 | 08/30/05 | $ | 100,488.92 |
| 10/21/2004 | 04/29/05 | 08/30/05 | $ | 778,509.67 |
| 10/21/2004 | 04/25/05 | 08/30/05 | $ | 211,165.66 |
| 10/21/2004 | 05/02/05 | 08/30/05 | $ | 316,698.05 |
| 10/21/2004 | 04/25/05 | 08/30/05 | $ | 237,295.56 |
| 10/21/2004 | 04/25/05 | 08/30/05 | $ | 179,024.72 |
| 10/21/2004 | 04/25/05 | 08/30/05 | $ | 181,479.10 |
| 10/21/2004 | 05/02/05 | 08/30/05 | $ | 97,852.14 |
| 10/21/2004 | 04/25/05 | 08/30/05 | $ | 168,008.64 |
| 10/21/2004 | 04/25/05 | 08/30/05 | $ | 193,505.03 |
| 10/21/2004 | 04/25/05 | 08/30/05 | $ | 26,447.15 |
| 11/26/2004 | 05/02/05 | 09/01/05 | $ | 705,838.01 |
| 11/26/2004 | 05/11/05 | 09/01/05 | $ | 289,785.60 |
| 11/26/2004 | 05/18/05 | 09/01/05 | $ | 858,298.08 |
| 11/26/2004 | 05/18/05 | 09/01/05 | $ | 176,441.29 |
| 11/26/2004 | 05/18/05 | 09/01/05 | $ | 91,701.01 |
| 11/26/2004 | 05/18/05 | 09/01/05 | $ | 249,759.59 |
| 11/26/2004 | 05/26/05 | 09/01/05 | $ | 43,787.48 |

| | | | | |
|---|---|---|---|---|
| 11/26/2004 | 05/26/05 | 09/01/05 | $ | 31,910.98 |
| 11/26/2004 | 05/26/05 | 09/01/05 | $ | 33,062.65 |
| 11/26/2004 | 05/26/05 | 09/01/05 | $ | 32,552.84 |
| 11/26/2004 | 05/26/05 | 09/01/05 | $ | 34,642.43 |
| 11/26/2004 | 05/26/05 | 09/01/05 | $ | 87,989.53 |
| 10/18/2004 | 04/25/05 | 09/02/05 | $ | 378,801.47 |
| 9/21/2004 | 04/25/05 | 09/02/05 | $ | 615,806.01 |
| 9/21/2004 | 04/25/05 | 09/02/05 | $ | 738,896.73 |
| 9/21/2004 | 04/25/05 | 09/02/05 | $ | 50,363.07 |
| 10/21/2004 | 04/29/05 | 09/02/05 | $ | 454,870.10 |
| 10/21/2004 | 05/02/05 | 09/02/05 | $ | 323,710.46 |
| 10/21/2004 | 05/02/05 | 09/02/05 | $ | 649,967.05 |
| 10/21/2004 | 05/11/05 | 09/02/05 | $ | 189,127.00 |
| 10/21/2004 | 04/25/05 | 09/07/05 | $ | 664,770.40 |
| 10/21/2004 | 04/25/05 | 09/07/05 | $ | 51,566.39 |
| 10/21/2004 | 04/25/05 | 09/07/05 | $ | 45,524.47 |
| 10/21/2004 | 04/25/05 | 09/07/05 | $ | 24,107.31 |
| 10/21/2004 | 04/25/05 | 09/07/05 | $ | 530,425.17 |
| 10/21/2004 | 04/25/05 | 09/07/05 | $ | 17,811.40 |
| 10/21/2004 | 04/25/05 | 09/07/05 | $ | 26,619.50 |
| 10/21/2004 | 04/29/05 | 09/07/05 | $ | 88,581.88 |
| 10/21/2004 | 04/29/05 | 09/07/05 | $ | 139,403.96 |
| 10/22/2004 | 04/25/05 | 09/07/05 | $ | 247,125.41 |
| 10/22/2004 | 04/25/05 | 09/07/05 | $ | 137,360.23 |
| 10/22/2004 | 04/29/05 | 09/07/05 | $ | 308,569.80 |
| 10/22/2004 | 04/29/05 | 09/07/05 | $ | 60,619.24 |
| 10/22/2004 | 05/11/05 | 09/07/05 | $ | 205,320.99 |
| 10/22/2004 | 04/29/05 | 09/07/05 | $ | 171,237.23 |
| 11/26/2004 | 05/02/05 | 09/07/05 | $ | 636,550.31 |
| 11/26/2004 | 05/02/05 | 09/07/05 | $ | 995,410.77 |
| 11/26/2004 | 05/02/05 | 09/07/05 | $ | 70,766.39 |
| 11/26/2004 | 05/02/05 | 09/07/05 | $ | 292,222.16 |
| 11/26/2004 | 05/02/05 | 09/07/05 | $ | 28,092.96 |
| 11/26/2004 | 05/11/05 | 09/07/05 | $ | 1,268,575.98 |
| 11/12/2004 | 05/18/05 | 09/08/05 | $ | 695,298.40 |
| 11/12/2004 | 06/06/05 | 09/08/05 | $ | 1,048,741.68 |
| 11/12/2004 | 05/02/05 | 09/08/05 | $ | 1,039,502.03 |
| 11/12/2004 | 05/11/05 | 09/08/05 | $ | 240,334.19 |
| 11/12/2004 | 05/11/05 | 09/08/05 | $ | 1,021,494.09 |
| 11/12/2004 | 05/11/05 | 09/08/05 | $ | 1,040,799.64 |
| 10/22/2004 | 04/25/05 | 09/09/05 | $ | 939,305.58 |
| 10/22/2004 | 04/29/05 | 09/09/05 | $ | 903,365.53 |
| 11/26/2004 | 05/02/05 | 09/09/05 | $ | 27,476.36 |
| 11/26/2004 | 05/02/05 | 09/09/05 | $ | 28,116.66 |
| 11/26/2004 | 05/02/05 | 09/09/05 | $ | 27,658.23 |
| 11/26/2004 | 05/02/05 | 09/09/05 | $ | 41,688.26 |
| 11/26/2004 | 05/02/05 | 09/09/05 | $ | 105,334.12 |
| 11/26/2004 | 05/02/05 | 09/09/05 | $ | 185,394.10 |
| 11/26/2004 | 05/02/05 | 09/09/05 | $ | 758,885.73 |
| 11/26/2004 | 06/07/05 | 09/09/05 | $ | 772,587.93 |
| 11/26/2004 | 06/09/05 | 09/09/05 | $ | 523,508.15 |
| 11/26/2004 | 05/11/05 | 09/09/05 | $ | 993,699.68 |

| | | | | |
|---|---|---|---|---|
| | 11/26/2004 | 05/11/05 | 09/09/05 | $ 349,762.06 |
| | 11/26/2004 | 05/11/05 | 09/09/05 | $ 144,640.47 |
| | 11/26/2004 | 05/18/05 | 09/09/05 | $ 26,921.04 |
| | 11/26/2004 | 05/18/05 | 09/09/05 | $ 94,652.57 |
| | 12/6/2004 | 05/26/05 | 09/09/05 | $ 957,636.38 |
| | 12/6/2004 | 06/06/05 | 09/09/05 | $ 1,014,939.92 |
| | 12/6/2004 | 06/30/05 | 09/09/05 | $ 330,749.28 |
| | 12/6/2004 | 06/30/05 | 09/09/05 | $ 111,568.35 |
| | 12/6/2004 | 06/30/05 | 09/09/05 | $ 30,168.61 |
| | 10/22/2004 | 04/25/05 | 09/12/05 | $ 381,962.63 |
| | 10/22/2004 | 04/25/05 | 09/12/05 | $ 713,121.60 |
| | 10/22/2004 | 04/25/05 | 09/12/05 | $ 176,413.42 |
| | 10/22/2004 | 04/25/05 | 09/12/05 | $ 75,615.97 |
| | 12/8/2004 | 06/20/05 | 09/12/05 | $ 719,430.33 |
| | 12/8/2004 | 06/06/05 | 09/12/05 | $ 37,367.02 |
| | 12/8/2004 | 06/21/05 | 09/12/05 | $ 423,778.20 |
| | 12/8/2004 | 06/06/05 | 09/12/05 | $ 34,537.22 |
| | 12/8/2004 | 06/14/05 | 09/12/05 | $ 21,256.96 |
| | 12/8/2004 | 06/14/05 | 09/12/05 | $ 13,239.09 |
| | 12/8/2004 | 06/14/05 | 09/12/05 | $ 31,903.93 |
| | 12/8/2004 | 06/14/05 | 09/12/05 | $ 23,940.97 |
| | 12/8/2004 | 06/14/05 | 09/12/05 | $ 18,634.65 |
| | 12/8/2004 | 06/14/05 | 09/12/05 | $ 34,522.82 |
| | 10/22/2004 | 05/02/05 | 09/13/05 | $ 734,061.49 |
| | 12/8/2004 | 05/26/05 | 09/15/05 | $ 1,429,992.26 |
| | 12/8/2004 | 05/26/05 | 09/15/05 | $ 1,025,708.96 |
| | 12/23/2004 | 05/26/05 | 09/15/05 | $ 660,001.49 |
| | 12/23/2004 | 05/26/05 | 09/15/05 | $ 300,839.97 |
| | 12/23/2004 | 06/09/05 | 09/15/05 | $ 147,392.03 |
| | 12/23/2004 | 06/09/05 | 09/15/05 | $ 63,413.01 |
| | 12/23/2004 | 06/09/05 | 09/15/05 | $ 391,490.31 |
| | 12/23/2004 | 06/20/05 | 09/15/05 | $ 696,470.71 |
| | 12/23/2004 | 06/09/05 | 09/15/05 | $ 314,625.64 |
| | 12/28/2004 | 06/30/05 | 09/15/05 | $ 772,643.33 |
| | 12/28/2004 | 06/30/05 | 09/15/05 | $ 629,028.97 |
| | 12/28/2004 | 06/30/05 | 09/15/05 | $ 141,299.68 |
| | 12/28/2004 | 06/30/05 | 09/15/05 | $ 189,647.48 |
| | 12/28/2004 | 06/30/05 | 09/15/05 | $ 301,949.02 |
| | 12/28/2004 | 07/05/05 | 09/15/05 | $ 231,419.66 |
| | 12/28/2004 | 07/05/05 | 09/15/05 | $ 104,909.14 |
| | 12/28/2004 | 07/05/05 | 09/15/05 | $ 222,684.16 |
| | 12/28/2004 | 07/05/05 | 09/15/05 | $ 382,693.51 |
| | 12/28/2004 | 07/05/05 | 09/15/05 | $ 34,848.18 |
| | 12/28/2004 | 07/05/05 | 09/15/05 | $ 21,206.79 |
| | 12/28/2004 | 07/05/05 | 09/15/05 | $ 39,383.43 |
| | 12/28/2004 | 09/01/05 | 09/15/05 | $ 184,748.31 |
| | 12/28/2004 | 09/01/05 | 09/15/05 | $ 99,702.21 |
| | 12/28/2004 | 09/01/05 | 09/15/05 | $ 81,666.92 |
| | 1/7/2005 | 06/23/05 | 09/15/05 | $ 756,380.46 |
| | 1/7/2005 | 06/24/05 | 09/15/05 | $ 727,698.50 |
| | 1/7/2005 | 06/24/05 | 09/15/05 | $ 773,240.28 |
| | 1/7/2005 | 06/24/05 | 09/15/05 | $ 225,673.76 |

| | | | | |
|---|---|---|---|---|
| 1/7/2005 | 07/05/05 | 09/15/05 | $ | 805,321.55 |
| 12/8/2004 | 06/06/05 | 09/16/05 | $ | 261,916.92 |
| 12/8/2004 | 06/06/05 | 09/16/05 | $ | 33,598.10 |
| 12/28/2004 | 09/08/05 | 09/16/05 | $ | 75,509.47 |
| 12/28/2004 | 09/08/05 | 09/16/05 | $ | 82,625.30 |
| 12/28/2004 | 09/08/05 | 09/16/05 | $ | 412,591.74 |
| 1/7/2005 | 06/24/05 | 09/16/05 | $ | 300,230.67 |
| 1/7/2005 | 06/24/05 | 09/16/05 | $ | 460,432.48 |
| 1/7/2005 | 06/30/05 | 09/16/05 | $ | 677,577.14 |
| 1/7/2005 | 08/01/05 | 09/16/05 | $ | 81,184.09 |
| 1/7/2005 | 08/01/05 | 09/16/05 | $ | 43,413.70 |
| 1/7/2005 | 08/01/05 | 09/16/05 | $ | 174,692.00 |
| 1/7/2005 | 08/01/05 | 09/16/05 | $ | 80,647.72 |
| 1/7/2005 | 08/12/05 | 09/16/05 | $ | 340,220.07 |
| 1/7/2005 | 08/12/05 | 09/16/05 | $ | 333,684.75 |
| 1/7/2005 | 08/18/05 | 09/16/05 | $ | 79,867.15 |
| 1/7/2005 | 08/18/05 | 09/16/05 | $ | 42,080.77 |
| 1/7/2005 | 08/18/05 | 09/16/05 | $ | 98,635.67 |
| 1/7/2005 | 08/18/05 | 09/16/05 | $ | 79,431.08 |
| 1/7/2005 | 06/23/05 | 09/16/05 | $ | 1,417,702.96 |
| 1/7/2005 | 07/05/05 | 09/16/05 | $ | 555,900.14 |
| 1/7/2005 | 07/08/05 | 09/16/05 | $ | 1,336,745.61 |
| 1/7/2005 | 07/05/05 | 09/16/05 | $ | 419,207.32 |
| 1/7/2005 | 07/14/05 | 09/16/05 | $ | 37,898.94 |
| 1/7/2005 | 07/14/05 | 09/16/05 | $ | 41,305.79 |
| 1/7/2005 | 07/14/05 | 09/16/05 | $ | 21,365.76 |
| 1/7/2005 | 07/14/05 | 09/16/05 | $ | 18,701.68 |
| 1/7/2005 | 07/14/05 | 09/16/05 | $ | 18,797.40 |
| 1/7/2005 | 08/15/05 | 09/16/05 | $ | 13,532.02 |
| 1/7/2005 | 08/15/05 | 09/16/05 | $ | 16,246.25 |
| 1/7/2005 | 08/15/05 | 09/16/05 | $ | 10,630.13 |
| 1/7/2005 | 08/15/05 | 09/16/05 | $ | 14,960.20 |
| 1/7/2005 | 08/15/05 | 09/16/05 | $ | 17,627.77 |
| 1/7/2005 | 08/15/05 | 09/16/05 | $ | 14,754.31 |
| 1/7/2005 | 08/15/05 | 09/16/05 | $ | 17,668.38 |
| 1/7/2005 | 08/15/05 | 09/16/05 | $ | 17,606.71 |
| 1/7/2005 | 08/15/05 | 09/16/05 | $ | 17,620.98 |
| 1/7/2005 | 09/09/05 | 09/16/05 | $ | 830,044.37 |
| 2/23/2005 | 08/04/05 | 09/16/05 | $ | 1,018,297.41 |
| 2/23/2005 | 08/12/05 | 09/16/05 | $ | 632,235.33 |
| 2/23/2005 | 08/04/05 | 09/16/05 | $ | 298,464.76 |
| 2/23/2005 | 08/04/05 | 09/16/05 | $ | 1,437,849.83 |
| 2/23/2005 | 08/04/05 | 09/16/05 | $ | 82,742.41 |
| 2/23/2005 | 08/04/05 | 09/16/05 | $ | 1,492,997.33 |
| 2/14/2005 | 08/04/05 | 09/16/05 | $ | 337,315.39 |
| 2/14/2005 | 08/04/05 | 09/16/05 | $ | 1,003,848.29 |
| 2/14/2005 | 09/09/05 | 09/16/05 | $ | 304,243.61 |
| 2/9/2005 | 07/21/05 | 09/16/05 | $ | 19,788.30 |
| 2/9/2005 | 07/21/05 | 09/16/05 | $ | 26,060.84 |
| 2/9/2005 | 07/21/05 | 09/16/05 | $ | 12,870.59 |
| 2/9/2005 | 07/21/05 | 09/16/05 | $ | 760,684.83 |
| 2/9/2005 | 08/08/05 | 09/16/05 | $ | 709,800.26 |

| | | | | |
|---|---|---|---|---|
| 2/9/2005 | 08/25/05 | 09/16/05 | $ | 745,191.45 |
| 2/9/2005 | 08/08/05 | 09/16/05 | $ | 748,050.33 |
| 2/9/2005 | 07/14/05 | 09/16/05 | $ | 1,023,857.50 |
| 2/9/2005 | 07/18/05 | 09/16/05 | $ | 337,562.31 |
| 2/9/2005 | 07/21/05 | 09/16/05 | $ | 792,199.73 |
| 2/9/2005 | 07/28/05 | 09/16/05 | $ | 804,019.65 |
| 2/9/2005 | 07/28/05 | 09/16/05 | $ | 340,509.60 |
| 10/21/2004 | 05/02/05 | 10/19/05 | $ | 427,933.44 |
| 10/21/2004 | 05/02/05 | 10/19/05 | $ | 10,635.39 |
| 10/21/2004 | 05/02/05 | 10/19/05 | $ | 63,658.45 |
| 10/22/2004 | 04/25/05 | 10/19/05 | $ | 1,400,199.12 |
| 11/26/2004 | 05/11/05 | 10/20/05 | $ | 764,576.20 |
| 11/26/2004 | 05/18/05 | 10/20/05 | $ | 42,155.02 |
| 12/23/2004 | 06/06/05 | 10/26/05 | $ | 666,695.92 |
| 12/28/2004 | 09/01/05 | 10/26/05 | $ | 141,262.05 |
| 2/23/2005 | 09/09/05 | 10/26/05 | $ | 538,556.09 |
| 2/23/2005 | 09/09/05 | 10/26/05 | $ | 727,092.51 |
| 2/14/2005 | 09/09/05 | 10/26/05 | $ | 80,518.63 |
| 2/14/2005 | 09/09/05 | 10/26/05 | $ | 78,664.26 |
| 2/14/2005 | 09/09/05 | 10/26/05 | $ | 81,750.74 |
| 2/14/2005 | 09/09/05 | 10/26/05 | $ | 95,141.28 |
| 2/14/2005 | 09/09/05 | 10/26/05 | $ | 72,458.01 |
| 2/14/2005 | 09/09/05 | 10/26/05 | $ | 93,036.77 |
| 2/14/2005 | 09/09/05 | 10/26/05 | $ | 157,043.84 |
| 2/14/2005 | 09/09/05 | 10/26/05 | $ | 184,361.42 |
| 2/14/2005 | 09/15/05 | 10/26/05 | $ | 33,756.98 |
| 2/14/2005 | 09/15/05 | 10/26/05 | $ | 40,338.36 |
| 2/14/2005 | 09/15/05 | 10/26/05 | $ | 90,288.37 |
| 2/14/2005 | 09/15/05 | 10/26/05 | $ | 236,454.46 |
| 2/14/2005 | 09/15/05 | 10/26/05 | $ | 261,205.15 |
| 2/14/2005 | 09/15/05 | 10/26/05 | $ | 82,228.55 |
| 2/14/2005 | 09/15/05 | 10/26/05 | $ | 81,492.10 |
| 11/26/2004 | 05/18/05 | 11/02/05 | $ | 39,332.43 |
| | | | **$78,997,917.04** | |

52.     The claims that BNP Paribas, BNP Paribas NA, BNP Paribas, Houston Agency, and Cruz made to USDA, or caused to be made to USDA, based on the guarantees identified in the Table set forth in Paragraph 51, were materially false and/or fraudulent because the guarantees were obtained by ineligible parties in violation of the material terms of the regulation authorizing such guarantees.  These claims were also false and fraudulent because false statements and records were used to obtain the guarantees at the outset of each of the related transactions.  The false statements and records were made and used by BNP Paribas in seeking

21

the guarantees that were the purpose of its MPSAs.  As part of that process, BNP Paribas caused promissory notes to be submitted to the USDA that falsely represented that the U.S. Exporters and Mexican Importers entered into an arms-length, valid and enforceable promissory note. False statements and records were also made by BNP Paribas when it submitted Assignment Notifications to the USDA in connection with the assignment of the USDA guarantees from an ineligible US Exporter.  The false statements and records referenced above were made by Cruz, as an employee of BNP Paribas, Houston Agency, on behalf of BNP Paribas under its MPSAs, and with the full knowledge and explicit approval of BNP Paribas NA.  The claims were also false and fraudulent because they were tainted by the illegal bribes, commissions, and gifts paid by Villarreal to Cruz in return for BNP Paribas, BNP Paribas NA, and BNP Paribas, Houston Agency's role in the conspiracy.  The claims were also false and fraudulent because portions of the related loan proceeds were diverted by the defendants and their co-conspirators to improper purposes not permitted by the SCGP.  Finally, the claims were false and fraudulent because they were connected to sham transactions that did not involve the actual export of qualified commodities and were in no way contemplated or permitted by the SCGP.

53.     BNP Paribas, BNP Paribas NA, BNP Paribas, Houston Agency, and Cruz submitted or caused to be submitted the above-described false and/or fraudulent claims on the CCC payment guarantees with knowledge that the claims were false, for the reasons set forth herein.  The United States has been damaged as a result of these false and/or fraudulent claims.

54.     As a result of their participation in the scheme described herein, BNP Paribas, BNP Paribas NA, BNP Paribas, Houston Agency, and Cruz have profited substantially.

## The Bank Defendants

55.     BNP Paribas, BNP Paribas NA, and BNP Paribas, Houston Agency, through their

employees, agents, and representatives: (1) had actual knowledge that the U.S. Exporters and

Mexican Importers were owned and/or controlled by Villarreal and were thus ineligible to

participate in the SCGP and/or that certain of the grain transactions for which CCC guarantees

were obtained were non-existent; (2) acted in deliberate ignorance of such information; and/or

(3) acted in reckless disregard of such information.

56.     Cruz was part of the Trade Finance group, which was a distinct business line of

BNP Paribas.  In that role, Cruz developed the portfolio of U.S. Exporters and, throughout the

relevant time period, acted as the relationship manager of that portfolio of SCGP business out of

BNP Paribas, Houston Agency.  Between 1998 and 2004, Cruz reported to David Schad, who,

upon information and belief, was employed by BNP Paribas NA and worked out of Dallas, TX,

while, in January 2005, Cruz' direct report changed to James Thompson, who, upon information

and belief, was employed by BNP Paribas NA.  Until January 2005, the exporters were clients

that were part of the Houston Corporate Group, whereupon they were transferred to Energy

Commodities Export Project (ECEP) Global Trade Services (GTS) at BNP Paribas NA.  Craig

Pierce, who was employed by BNP Paribas, Houston Agency, acted as the credit analyst for that

SCGP business for the bulk of the relevant time period.  As the credit analyst, Pierce prepared

client acceptance and credit proposals to be approved by the Client Acceptance Committee of

BNP Paribas NA.  The credit authorities in BNP Paribas, predominantly through the Comite de

Paris, monitored, and in certain instances, requested information about and/or provided approval

for specific credit facilities associated with the SCGP.  Pierce, Cruz, Schad, and Thompson all

had a working knowledge and understanding of the regulations and restrictions that governed the SCGP.

57.     The creation of each of BNP Paribas' credit relationship with the exporter clients, and each extension of credit thereto, was carried out by BNP Paribas, Houston Agency employees, and analyzed and approved by BNP Paribas NA's Client Acceptance Committee (and, in certain instances, the Comite de Paris). The credit approval forms were called "North America Signature Credit Approval Forms." The credit approval requests were circulated to a distribution list of individuals, in both New York and Paris, responsible for analyzing and/or reviewing the credit proposals on behalf of BNP Paribas or BNP Paribas NA. The guidelines and rules governing such approvals were mandated by BNP Paribas and BNP Paribas NA. Once authorizing signatures were obtained from David Schad (and later James Thompson) and the Senior Credit Officer of the CAC (either George Seligman or Michael Dondiego, both of whom worked for BNP Paribas NA), the credit relationship and/or credit facility was fully authorized by BNP Paribas. In certain instances the Chief Credit Officer (Pierre Lemonnier), from BNP Paribas NA, also executed the credit approvals. The credit relationships and credit facilities at issue in this case were so authorized.

58.     BNP Paribas and BNP Paribas NA maintained policies that mandated that the bank understand exactly who its clients were. These policies were generally referred to as "KYC" (Know Your Client) policies. The BNP KYC policies applied to the clients associated with the SCGP portfolio – the U.S. Exporters. Despite these policies, very little information was collected, let alone verified, about the U.S. Exporters, a fact that BNP Paribas, BNP Paribas NA, and BNP Paribas, Houston Agency knew.

59. BNP Paribas is the financial institution that extended the credit to the U.S. Exporters, through the activities of its Houston Agency, and with explicit approval of BNP Paribas NA.

60. In 2001, BNP Paribas NA's Risk Management group conducted a field audit of the SCGP portfolio in Houston to assess the operating procedures pursuant to which the business was conducted. Pursuant to the audit, it was determined that additional documentation should be requested for each transaction for which a guarantee was requested.

61. In August 2003, BNP Paribas NA conducted an internal audit recognizing that BNP Paribas' policies and procedures required a thorough understanding of the clients to whom the bank provided lines of credit in order to properly assess the risk associated with the client/facility. The audit concluded that the credit proposals associated with the SCGP portfolio should contain details on the Borrower and its management and should include their audited financials. These proposals, however, were not implemented, and BNP Paribas NA, through its continued oversight, knew or should have known these proposals were not implemented. Likewise, BNP Paribas, through its oversight, knew or should have known these proposals were not implemented. Instead, BNP Paribas, Houston Agency, BNP Paribas NA, and BNP Paribas relied solely on the fact that the credit they extended was covered by a guarantee from the USDA.

62. As it was their credit facilities implicated in the scheme, BNP Paribas and BNP Paribas NA were responsible, along with BNP Paribas, Houston Agency, for submitting the claims on the guarantees to the USDA. In April 2005, when the defaults commenced, Pierre Schneider, of BNP Paribas in Paris, was advised by Helene Leclerc, Head of Corporate and

25

Investment Banking (CIB) Audit in Paris, that "[t]his situation is quite an issue for the business as the activity was recently transfer[ed] to GTS and the unpaid outstanding of 76,995MUSD may be the result of a fraud.  Accordingly we would appreciate a mission from General Inspection.  If you cannot or do not want to do it I will check with Patrick Brissiaud how CIB audit could do it."   In response thereto, Gilles Brochard, of BNP Paribas in Paris, wrote, "There is no reason, for the time being, that General Inspection investigate this file.  If we can easily imagine a serious conflict between the clients and CCC, there is no evidence of a suspicion of fraud.  We will appreciate to be regularly kept informed by the business line of any development in the negotiations already opened.  We are obviously prepared to reconsider our position in the futur[e].  New York Audit has a good knowledge of the file, it will be interesting to have in due course a follow up on its recommendations relating to the discrepencies identified in the management of the LCs."

63.     In May 2005, U.S. CIB Audit, Financing Activities, conducted an audit of the SCGP portfolio.  Among other observations, the Audit noted that "credit proposals change very little from year to year and are substantially a 'boiler plate' reproduction of the prior year's proposal.  NACC minutes are much the same." The Audit further noted that "it appears that both Houston Corporate and the Risk Department placed exclusive reliance on the CCC guaranteed nature of the financings (the primary risk was considered documenting the transactions in accord with CCC requirements).  As such, neither Risk nor the Business line required detailed financial statements from the borrower and the credit proposals did not include analyses of the company, management, industry, financial condition, financial flexibility, and potential risks.  Furthermore,

the information on Vista and the Mexican importers who are the main players in all these transactions if very thin and, in our opinion, not sufficient."

64.     The Audit concluded that "there was no robust KYC process for the parties involved in these transactions. Houston Corporate and Risk continuously emphasized complete reliance on the ultimate repayment source – CCC guarantees. Internally the information on the exporters, importers and the supplier (Vista) is not sufficient to enable Audit to reach a definitive conclusion on the roles played by each party and the possible causes of default. It appears that the exporters were simply a middleman between one supplier and the four Mexican importers who were the primary repayment source."

65.     On June 10, 2005, Alamo Feeders, Inc., one of the U.S. Exporters, sent a letter to Jerry Cruz, at BNP Paribas in Texas, copying George Andrianos, who worked with James Thompson for BNP Paribas NA, in New York, requesting "BNP Paribas to *stop* asking our company to change and/or alter documents that have already been submitted to your bank, submitted to USDA/CCC, and/or have already been signed by us and our importer if applicable."

66.     In performing activities with respect to the SCGP, including entering into MPSAs, extending credit to the US Exporters, receiving assignments from the US Exporters, obtaining guarantees from and making certifications to the USDA, and preparing and submitting claims to the USDA, Cruz acted with the full knowledge and written authority of BNP Paribas and BNP Paribas NA. Cruz's activities and actions pertaining to the SCGP were carried out for the benefit of and profited both BNP Paribas and BNP Paribas NA. Cruz's activities were described in detailed credit memoranda and Client Acceptance memoranda. These memoranda were provided to and approved by BNP Paribas and BNP Paribas NA.

67. The USDA referred the commodity guarantee scheme to the United States Attorney's Office for the Southern District of Texas (USAO), Criminal Division, in or about June or July 2005, for investigation. An investigation of the scheme by the USAO, Criminal Division, did not commence before August 11, 2005. On March 24, 2010, Cruz, Villarreal, See, Gonzalez, Hinojosa and Villalon were indicted on charges pertaining to the scheme. On information and belief, the official of the United States charged with responsibility to act in the circumstances did not know nor should have known the facts material to the right of action any earlier than October 19, 2005, and the United States believes it is probable that the date is later.

### COUNT I
### Violation of the False Claims Act
### 31 U.S.C. §§ 3729(a)(1)
### (Against BNP Paribas, BNP Paribas NA, BNP Paribas, Houston Agency, and Cruz)

68. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 67 above, as if fully set forth herein.

69. Defendants BNP Paribas, BNP Paribas NA, BNP Paribas, Houston Agency, and Cruz violated the False Claims Act, 31 U.S.C. § 3729(a)(1), by knowingly presenting or causing to be presented to the United States Government, false or fraudulent claims for payment on the CCC commodity payment guarantees assigned to BNP Paribas by any of the U.S. Exporters, and pertaining to agricultural commodity sales to any of their related Mexican Importers, and which the United States paid, as set forth in the Table in Paragraph 51 herein.

70. Pursuant to 31 U.S.C. § 3729(a), Defendants are liable to the United States Government for a civil penalty of not less than $5,500, and not more than $11,000 for each violation of the FCA committed by defendants.

28

71.     As a result of Defendants' false or fraudulent acts as described above, the United States Government has sustained damages in an amount to be determined at trial.  Pursuant to 31 U.S.C. § 3729(a), defendants are liable for three times the amount of all such damages sustained by the United States Government because of the conduct of BNP Paribas, BNP Paribas NA, BNP Paribas, Houston Agency and Cruz.

**COUNT II**
**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)(2009)**
**(Against BNP Paribas, BNP Paribas NA, BNP Paribas, Houston Agency, and Cruz)**

72.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 71 above, as if fully set forth herein.

73.     Defendants BNP Paribas, BNP Paribas NA, BNP Paribas, Houston Agency, and Cruz violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2009) by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, which the United States paid.

74.     Pursuant to 31 U.S.C. § 3729(a), defendants are liable to the United States Government for a civil penalty of not less than $5,500, and not more than $11,000 for each violation of the FCA committed by defendants.

75.     The United States Government has sustained damages, in an amount to be determined at trial.  Pursuant to 31 U.S.C. § 3729(a), defendants are liable for three times the amount of all such damages sustained by the United States Government.

## COUNT III
### Violation of the False Claims Act
### 31 U.S.C. §§ 3729(a)(3)__
### (Against BNP Paribas, BNP Paribas NA, BNP Paribas, Houston Agency, and Cruz)

76.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 75 above, as if fully set forth herein.

77.    Defendants BNP Paribas, BNP Paribas NA, BNP Paribas, Houston Agency, and Cruz have violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(3) by knowingly conspiring to defraud the government by getting a false or fraudulent claim allowed or paid, and which the United States paid.

78.    Pursuant to 31 U.S.C. § 3729(a)(3), defendants are liable to the United States Government for a civil penalty of not less than $5,500, and not more than $11,000 for each violation of the FCA committed by defendants.

79.    The United States Government has sustained damages, in an amount to be determined at trial.  Pursuant to 31 U.S.C. § 3729(a), defendants are liable for three times the amount of all such damages sustained by the United States Government.

## COUNT IV
### For Unjust Enrichment
### (Against BNP Paribas, BNP Paribas NA, BNP Paribas, Houston Agency, and Cruz)

80.    The government hereby incorporates by reference paragraphs 1 through 79, as though fully set forth herein.

81.    Defendants BNP Paribas, BNP Paribas NA, and BNP Paribas, Houston Agency, would be unjustly enriched if they are permitted to retain monies paid by the government

30

pursuant to claims for loss submitted by BNP, and are under a duty to repay those monies to the government.

82.     Defendant Cruz would be unjustly enriched if he is permitted to retain monies received in the form of bribes or kickbacks from the proceeds of funds ultimately paid by the government pursuant to claims for loss submitted by BNP, and he is under a duty to repay those monies to the government.

**COUNT V**
**For Payment By Mistake**
**(Against BNP Paribas, BNP Paribas NA, and BNP Paribas, Houston Agency)**

83.     The government hereby incorporates by reference paragraphs 1 through 82, as though fully set forth herein.

84.     The government's payments to defendants BNP Paribas, BNP Paribas NA, and BNP Paribas, Houston Agency pursuant to claims for loss submitted by BNP were paid under mistake, and BNP Paribas, BNP Paribas NA, and BNP Paribas, Houston Agency are not entitled to retain those monies, but instead are under a duty to repay those monies to the government.

**PRAYER FOR RELIEF**

85.     WHEREFORE, plaintiff United States prays for judgment against the defendants, as follows:

A.      As to Counts I, II, and III under the False Claims Act, 31 U.S.C. § 3729(a), against BNP Paribas, BNP Paribas NA, BNP Paribas, Houston Agency, and Cruz, for treble the damages sustained by the United States to be proven at trial, plus civil penalties as are allowable by law in the amount of $5,500 to $11,000 per violation, post-judgment interest, and costs;

31

      B.      As to Count IV, unjust enrichment, against BNP Paribas, BNP Paribas NA, BNP Paribas, Houston Agency, and Cruz, for the sums by which defendants have been unjustly enriched, which will be proven at trial, plus pre-judgment and post-judgment interest, and costs; and

      C.      As to Count V, payment by mistake, against BNP Paribas, BNP Paribas, and BNP Paribas, Houston Agency, for the sums mistakenly paid by the United States, which will be proven at trial, and for pre-judgment and post-judgment interest, and costs.

THE UNITED STATES DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE.

Dated: September 5, 2012

                                              Respectfully submitted,

                                              **Attorneys for United States of America**

                                              STUART F. DELERY
                                              Acting Assistant Attorney General

By:

                                              Michael D. Granston
                                              Michal Tingle
                                              Linda M. McMahon (admitted *pro hac vice*)
                                              Donald J. Williamson (admitted *pro hac vice*)
                                              Samuel J. Buffone (admitted *pro hac vice*)

                                              U.S. Department of Justice
                                              Civil Division
                                              P. O. Box 261
                                              Ben Franklin Station
                                              Washington, D.C. 20044

(202) 307-0448
Email: linda.mcmahon2@usdoj.gov
Email: don.williamson@usdoj.gov
Email: samuel.buffone@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On the 5th day of September, 2012, a copy of the United States' First Amended Complaint was filed electronically using the Court's Electronic Case Filing System. Notice of this filing was sent electronically to counsel of record using the Court's electronic notification system. Parties may access this filing through the Court's Electronic Case Filing System.

<u>/s/ *Linda M. McMahon*</u>
Linda M. McMahon